[No. 69039-6-I.   Division One.   August 19, 2013.]

MUKILTEO RETIREMENT APARTMENTS, LLC, *Respondent*, v.
MUKILTEO INVESTORS LP ET AL., *Appellants*.

*James A. Perkins* (of *Larson Berg & Perkins PLLC*); and *Michael B. King*, *Jason W. Anderson*, and *Justin P. Wade* (of *Carney Badley Spellman PS*), for appellants.

*John A. Bender Jr.*, *Jerry H. Kindinger*, and *Robert R. King* (of *Ryan Swanson & Cleveland PLLC*), for respondent.

¶1 DWYER, J. — Rule of Appellate Procedure (RAP) 2.5(a)(2) permits an appellant to claim as error, for the first time on appeal, the "failure to establish facts upon which relief can be granted." While functioning as an exception to the general rule that we do not consider new theories and arguments on appeal, the rule's applicability is limited to circumstances wherein the proof of particular facts at trial is required to sustain a claim. Where "relief can be granted" in the absence of such proof, RAP 2.5(a)(2) does not operate to permit a claimant to argue for the first time on appeal that particular facts were not established at trial.

¶2 In this case, Mukilteo Retirement Apartments LLC (MRA) filed a lawsuit for the specific performance of an

option agreement that granted MRA the right to purchase a retirement facility from Mukilteo Investors Limited Partnership (MILP). In turn, MILP counterclaimed against MRA, contending that MRA had breached the option agreement by declining to accept MILP's proposed purchase price. Following a bench trial, the trial court determined that MILP had breached the option agreement. The court thereafter entered a decree of specific performance requiring MILP to sell the facility to MRA.

¶3 On appeal, MILP contends, for the first time in over three years of litigation, that the option agreement was unenforceable because the parties failed to reach mutual assent regarding a method for determining the facility's purchase price. The issue of the contract's enforceability, however, was neither raised within the pleadings of the parties nor litigated at trial by either implied or express consent. Accordingly, MRA was not required to introduce any evidence in order to prove the existence of an enforceable contract. Because in such circumstances RAP 2.5(a)(2) does not permit an appellant to raise the question of a contract's enforceability for the first time on appeal, MILP has failed to demonstrate an entitlement to appellate review of this issue. MILP's additional contentions are also without merit, and accordingly, we affirm the trial court in all respects.

I

¶4 In 1997, Ron Struthers and Duane Clark purchased undeveloped real property in the Harbor Pointe area of Mukilteo. They formed Mukilteo Retirement Apartments LLC for the purpose of developing the property into an independent living and assisted living facility for seniors. Over the course of the following year, Struthers and Clark secured the permits and obtained architectural plans necessary to construct the facility.

¶5 In the spring of 1999, Struthers and Clark realized they had insufficient funds to complete construction of the

facility. Accordingly, they contacted Carl Campbell, whose construction company, Campbell Homes Construction Inc., was a leading builder of similar facilities in the Northwest. They discussed an arrangement in which Campbell Homes would purchase the property, build the facility, and then lease it back to MRA. Struthers and Clark told Campbell that such an agreement must also include an option for MRA to purchase the facility at a future date.

¶6 MILP was formed as the legal entity to purchase, construct, and lease the facility back to MRA.[1] On October 21, 1999, following extensive negotiations, MILP agreed to purchase the property and construct the facility. MRA signed a 20-year lease to staff and operate the facility, including responsibility for all upkeep and maintenance. The lease provided for annual increases in monthly rent beginning in the fifth year of occupancy.[2] Although MRA believed that these monthly rental payments exceeded market rents, it agreed to the lease terms in order to secure a contractual right to purchase the facility from MILP.

¶7 Accordingly, the parties entered into an option agreement, giving MRA the right to purchase the facility after eight years. The "facility" was defined as the real property, as improved, together with certain personal property. The parties agreed that the purchase price would reflect the highest of three pricing methods: (1) the "fair market value" of the facility on the date the option was exercised, (2) the "replacement cost" of the facility, or (3) the "prospective fair

---

[1] Ownership of MILP initially consisted of Campbell Homes (2 percent), Kris Campbell (49 percent) and HD Retirement Investors, LLC (49 percent). Campbell Homes was designated as the general partner of MILP. Kris Campbell, the grandson of Carl Campbell, also served as the vice president of Campbell Homes.

[2] Keith Therrien, Campbell Homes' longtime attorney, drafted the agreements. MRA also engaged an attorney, Ed Beeksma, to provide it with legal advice during the negotiations.

market value" set forth in an attached exhibit (Schedule D), reflecting a base price with annual increases of 3 percent.[3]

¶8 The agreement specified that following MRA's exercise of the option, MILP and MRA would have 15 days to reach agreement regarding the "fair market value" of the facility. If no agreement could be reached within that time period, each party would then have five additional days to appoint a disinterested appraiser. Each appraiser would then have 30 days to appraise the facility's fair market value. In the event that only one appraiser was appointed or only one appraiser completed the appraisal within the 30-day period, that appraiser's determination of fair market value would be "final and binding upon the parties."

¶9 By contrast, "replacement cost" was to be determined by an appraiser of MILP's choosing. MILP's selection of such an appraiser was to occur "pursuant to" the same paragraph setting forth the procedure for appointing an appraiser to determine "fair market value." Replacement cost was to be "included in the appraiser's appraisal report on the Facility."

¶10 The option agreement stipulated that MRA must exercise its option to purchase the facility during the period beginning on the "eighth (8th) anniversary of the commencement date of the Facility Lease Agreement" and ending on the "first day of the twelfth (12th) month" following that anniversary. The facility lease agreement stipulated that the lease term would commence upon the earlier of (1) "the issuance of a certificate of occupancy" or (2) MRA taking possession for the purpose of installing trade fixtures, personal property, and equipment for use in the operation of the facility.

¶11 MILP thereafter secured a loan and began construction. Following the completion of the facility, MRA took possession on or around June 1, 2000. A certificate of

---

[3] The parties and the trial court refer to the attached exhibit as "Schedule D." This convention is also adopted herein.

occupancy was issued by Snohomish County on June 15, 2000.

¶12 MRA hoped to exercise its option to purchase the facility as soon as possible. MRA believed that the commencement date for exercising the option was October 21, 2007—eight years from the date of execution of the lease agreement. Accordingly, on November 14, 2007, MRA sent notice to MILP that it was exercising its option to purchase the facility. MRA noted its willingness to negotiate a closing date but emphasized that time was of the essence. When MILP did not respond, MRA sent a second letter on December 9, 2007, asking MILP to confirm a purchase price of $16,024,643, the 2008 purchase price set forth by Schedule D. MRA explained that it was in the process of securing financing.

¶13 MILP replied by letter on December 28, 2007. The letter explained MILP's position that the earliest the option could be exercised was June 15, 2008, eight years after the date upon which the certificate of occupancy was issued. MILP invited MRA to send another notice at that time.

¶14 Nevertheless, on January 3, 2008, MILP retained an appraiser, James A. Brown and Associates, to provide an "analysis of the facility lease agreement and option agreement to determine the proper method of determining the option purchase price under the option agreement for the assets subject thereto." MRA was not informed that James Brown had been retained; nor was MRA provided a copy of the report. Indeed, James Brown neither maintained a working file nor prepared a written report detailing its conclusions with respect to this project.

¶15 On February 21, 2008, MRA sent a draft purchase and sale agreement to MILP, inviting further negotiation or revision "regarding closing dates, etc."[4] MILP responded to

---

[4] The suggested purchase price contained in this document, $15,557,906, reflects the purchase price of the facility set forth in Schedule D for 2007.

this letter on March 14, 2008, again rejecting MRA's attempt to exercise the option as premature.[5]

¶16 During this period, the ownership of MILP was being substantially restructured. Kris Campbell and Campbell Homes were divested of their interests in MILP, and Cimco Properties, a wholly owned entity of Thomas Dye, became the new general partner. Keith Therrien and Les Powers, Campbell Homes' longtime attorneys, also obtained substantial ownership interests in MILP.

¶17 Struthers and Clark met with Dye several times during the spring and summer of 2008. They repeatedly noted MRA's desire to purchase the facility. Nevertheless, although Dye stated that he wished to be accommodating and acknowledged MRA's concerns over price, financing, and a closing date, he did not offer to sell the facility. Instead, Dye presented a proposal whereby MRA could obtain a 20 percent ownership interest in the facility.[6] Struthers and Clark, however, had no interest in this arrangement.

¶18 On June 20, 2008, Dye persuaded Struthers and Clark to meet with him again. Once again, there was no offer from MILP to sell the facility outright to MRA. However, in this proposal, which assumed the facility's fair market value to be $16.75 million, MILP offered to convey a larger ownership interest to MRA. More importantly to Struthers and Clark, the proposal gave MRA the right to purchase the entire facility through a second option agreement. After further negotiations, Struthers and Clark agreed to purchase a 40 percent interest in the Harbor Pointe facility with an option to purchase the remaining 60 percent at the end of another 10 years.

---

[5] MRA and MILP were unable to reach agreement regarding the date that MRA could properly exercise its option. On November 30, 2010, the trial court determined that the option period began on June 15, 2008, eight years from the date upon which the certificate of occupancy was issued.

[6] This proposal noted that the facility's "assumed" fair market value was $18.24 million.

¶19 For the next month and a half, Struthers and Clark heard nothing from MILP regarding the status of this new agreement. Finally, on August 4, 2008, Dye sent another proposal. This offer, however, differed substantially from the previously agreed upon arrangement. Although the new proposal still included the opportunity for MRA to acquire a 40 percent ownership interest in the facility, it no longer included an option for MRA to purchase the remaining 60 percent of the facility after 10 years.

¶20 On August 28, 2008, MRA filed suit for specific performance, monetary damages, and declaratory relief.

¶21 On September 17, 2008, MILP again engaged James Brown to perform a fair market and replacement cost analysis of the facility. On October 10, appraiser Aaron Brown, who was assigned to perform the analysis, sent a draft report to MILP. Therrien reviewed the report and made a series of changes. Most significantly, Therrien deleted Brown's inclusion of depreciation as a factor for determining replacement cost, writing into the report that the option agreement contemplated the replacement cost of an undepreciated facility. This modification was later estimated to increase James Brown's valuation of the facility by approximately $3 million. James Brown ultimately accepted all of Therrien's changes.

¶22 James Brown issued its final report on November 7, 2008, more than 30 days after MILP had engaged its services. Nevertheless, its transmittal letter was backdated to October 10, 2008. In its report, James Brown opined that the facility's fair market value was $24 million and that its undepreciated replacement cost was $27 million.

¶23 On November 10, 2008, MILP offered to sell the facility to MRA for $27 million, the facility's replacement cost as determined by James Brown. MILP stated that this figure was "not subject to challenge."

¶24 Both parties moved for summary judgment in March 2012. MRA sought a determination that MILP had breached

the option agreement by refusing to sell the property except at the "replacement cost" determined by James Brown. MILP, in turn, sought a determination that the option had been exercised by MRA and requested that the purchase price be set at $27 million. The trial court denied both motions.

¶25 A bench trial commenced in May 2012, and after four weeks of testimony, the trial court found in favor of MRA. MILP, the court determined, had breached the implied covenant of good faith and fair dealing by deliberately attempting to prevent MRA from purchasing the facility. The court further ruled that MILP had breached the option agreement and that MRA was entitled to specific performance and consequential damages. The trial court set the purchase price of the facility at $18.725 million, which represented the midpoint between MRA's appraisers' determinations of fair market value as of June 15, 2008. MRA was allotted nine months from July 15, 2012 to close the transaction.[7] As consequential damages, the court awarded to MRA the amount of its rental payments to MILP during the period of June 15, 2008 to July 15, 2012.

¶26 MILP appeals.

## II

¶27 MILP first contends that the trial court erred by enforcing the option agreement after determining that there was no meeting of the minds with respect to determining "replacement cost," one of three valuation methods contemplated by the agreement for determining the purchase price of the facility. MILP asserts that, although it admitted in its answer that the option agreement was a valid and binding contract, RAP 2.5(a)(2)—which permits

---

[7] The trial court ruled that MRA was obligated to continue to make lease payments from July 15, 2012 until the date of closing. The court noted that it would "retain jurisdiction to extend the closing if circumstances warrant and upon such terms as may be warranted."

an appellant to raise, for the first time on appeal, the "failure to establish facts upon which relief can be granted"—entitles MILP to appellate review of this issue. However, in promulgating RAP 2.5(a)(2), our Supreme Court did not intend to render the civil rules of pleading nullities. Where one party has expressly informed the other that it will not defend on a particular basis (and trial thereafter proceeds as though the issue has been definitively resolved), RAP 2.5(a)(2) does not function to permit an appellant to raise the issue for the first time on appeal. Moreover, even had MILP properly raised the issue of the contract's validity at trial, because the option agreement included all the essential terms of a valid contract, the trial court did not err by enforcing it. We discuss each of these determinations in turn.

## A

¶28 Our Supreme Court has inherent authority to adopt procedural rules necessary to the operation of the courts. *State v. Edwards*, 94 Wn.2d 208, 212, 616 P.2d 620 (1980). "As all court rules emanate from one source, it is reasonable to conclude that when the Supreme Court promulgates a rule, it is aware of all other rules and thus can avoid adopting contradictory rules." *Hedlund v. Vitale*, 110 Wn. App. 183, 188, 39 P.3d 358 (2002). Accordingly, in interpreting the various court rules of our state, we presume that the Supreme Court intended that such rules apply harmoniously.

¶29 It is, of course, among the most fundamental rules of pleading that a defendant's answer must "state in short and plain terms his [or her] defenses to each claim asserted and admit or deny the averments upon which the adverse party relies." CR 8(b). If the defendant intends to deny only a part of an averment, "he [or she] shall specify so much of it as is true and material and shall deny only the remainder." CR 8(b). "The theory of Rule 8 is that a

defendant's pleading should apprise the plaintiff of the allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established to enable plaintiff to prevail." *Yarnell v. Roberts,* 66 F.R.D. 417, 423 (E.D. Pa. 1975). As the courts of our state have long held, " '[t]he purpose of an answer is to formulate issues by means of defenses addressed to the allegations of the complaint.' " *Shinn Irrigation Equip., Inc. v. Marchand,* 1 Wn. App. 428, 432, 462 P.2d 571 (1969) (quoting *Lopez v. U.S. Fid. & Guar. Co.,* 15 Alaska 633, 18 F.R.D. 59, 61 (1955)).

¶30 Here, in its complaint, MRA alleged that "[t]he Option Agreement that contains all material terms of the parties' obligations is a valid and binding contract for plaintiff's option to purchase the real property." In its answer, MILP agreed. MILP responded that it "admits the option agreement was a valid and binding contract as between the parties." Indeed, in reliance upon the existence of a valid option contract, MILP brought its own counterclaim, alleging that MRA had breached the agreement by failing to pay the $27 million "replacement cost" determined by its appraiser.

¶31 MILP's answer informed MRA that the enforceability of the contract would not be an issue at trial and that MRA need not offer any evidence to prove a valid and binding contract containing the essential terms of the parties' bargain. Rather, the issues to be litigated were limited to determining which party had breached the agreement and what damages resulted therefrom. Although this would require a determination of the meaning of the parties' contractual agreement, the contract's enforceability was not an issue raised within the pleadings.

¶32 The civil rules of our state provide a specific mechanism for circumstances where issues outside the

pleadings arise at trial.[8] CR 15(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." "At the discretion of the trial court, the pleadings may be amended to conform to the evidence at any stage in the action, including at the conclusion of a trial, and even after judgment." *Green v. Hooper*, 149 Wn. App. 627, 636, 205 P.3d 134 (2009). " 'However, amendment under CR 15(b) cannot be allowed if actual notice of the unpleaded issue is not given, if there is no adequate opportunity to cure surprise that might result from the change in the pleadings, or if the issues have not in fact been litigated with the consent of the

---

[8] MILP contends that, because MRA introduced evidence tending to disprove that the parties manifested mutual assent to an essential term of the option contract, it is not bound by its "judicial admission" that the contract was valid and binding. It asserts that it is well established that a plaintiff waives reliance on a defendant's judicial admission where the plaintiff introduces evidence that tends to disprove his or her own case.

However, no court in our state has adopted such a rule. Indeed, as Justice Madsen has noted, judicial admissions within a defendant's answer "have been defined as 'stipulations by a party or its counsel that have the effect of withdrawing a fact from issue and *dispensing wholly with the need for proof of the fact*.' " *Key Design, Inc. v. Moser*, 138 Wn.2d 875, 893, 983 P.2d 653, 993 P.2d 900 (1999) (Madsen, J., concurring/dissenting) (quoting 2 McCORMICK ON EVIDENCE § 254, at 142 (John W. Strong ed., 4th ed. 1992)). Such admissions are " 'proof possessing the highest possible probative value. Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, *but beyond the power of evidence to controvert them.*' " *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983) (emphasis added) (quoting *Hill v. Fed. Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941)). Thus, it is not true, as MILP would have it, that all courts have considered a defendant's judicial admissions so easily waived.

More importantly, MILP's agreement that the option contract was a "binding and valid" contract was more than a judicial admission as to a particular fact. Instead, as discussed above, MILP's answer to MRA's averment formulated the issues that would be litigated at trial. Through this pleading, MILP expressly informed MRA that it would not defend MRA's breach of contract action on the basis that the option contract was unenforceable. Indeed, MILP itself relied upon the validity of the contract in bringing its counterclaim against MRA for breach of contract. Where an issue is not raised in the pleadings, as was the case here, CR 15(b) provides the exclusive means for determining whether resolution of that issue constitutes the proper basis for a judgment.

parties.' "[9] *Green*, 149 Wn. App. at 636 (quoting *Harding v. Will*, 81 Wn.2d 132, 137, 500 P.2d 91 (1972)). In determining whether the parties impliedly consented to the trial of an issue, "an appellate court will consider the record as a whole, including whether the issue was mentioned before the trial and in opening arguments, the evidence on the issue admitted at the trial, and the legal and factual support for the trial court's conclusions regarding the issue." *Dewey v. Tacoma Sch. Dist. No. 10*, 95 Wn. App. 18, 26, 974 P.2d 847 (1999).

¶33 Here, neither MRA nor MILP expressly or impliedly consented to try the issue of the option contract's enforceability. Indeed, throughout the litigation, both parties asserted that the contract should be enforced—MRA contending that MILP had breached the option agreement "by rejecting [MRA's] attempts to exercise its option," and MILP asserting that "it [was] MRA who has breached the option agreement by failing to purchase the property for the required option price on time, as required by the option agreement." No challenge to the enforceability of the contract was noted in the various motions of the parties, in their trial briefs, or during opening argument. Although the parties disagreed at trial regarding the meaning of the term "replacement cost," neither party argued that this disagreement rendered the contract unenforceable. *See* 25 DAVID K. DEWOLF ET AL., WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 2:8, at 43 (2d ed. 2007) ("Mutual assent does not . . . require both parties to have an actual and identical understanding of all of the nuances of the bargain."). MILP, MRA, and the trial court—which entered no conclusion of law regarding the contract's validity and instead simply enforced it—all treated the question of the contract's enforceability as affirmatively established.

---

[9] Where issues outside the pleadings have in fact been litigated, the mere failure to amend the pleadings does not affect the result of the trial of these issues. CR 15(b).

¶34 Indeed, if the issue of the contract's enforceability had been litigated, a host of additional questions would necessarily have arisen. MRA, for instance, asserts that it agreed to pay above-market rents to MILP in order to secure a contractual right to purchase the facility from MILP at a later date. Thus, MRA contends, the option agreement was a material part of the consideration for the lease agreement. If true, then a determination that the option agreement was invalid would raise the issue of whether the lease agreement failed for lack of consideration. At minimum, it would require the trial court to determine if the rents were in fact above-market, the amount of the overcharge, and the extent to which MILP would be required to disgorge past rent payments in order to avoid unjust enrichment. As noted above, none of these questions emerged during the trial.

¶35 Nevertheless, although the issue of the option contract's enforceability made no appearance at any stage of the litigation, MILP asserts that this matter may be raised for the first time on appeal pursuant to RAP 2.5(a)(2). In general, we will not review an issue, theory, argument, or claim of error not presented at the trial court level. *Pellino v. Brink's, Inc.*, 164 Wn. App. 668, 685 n.8, 267 P.3d 383 (2011). RAP 2.5(a)(2), however, provides a limited exception to the general rule, permitting a party to claim as error for the first time on appeal the "failure to establish facts upon which relief can be granted." MILP asserts its claim falls within this exception.[10]

¶36 As noted above, the Supreme Court promulgates the procedural rules of our courts with the intent that such

---

[10] We note that we have previously refused to review the question of a contract's enforceability where the issue was raised for the first time on appeal. *Neiffer v. Flaming*, 17 Wn. App. 443, 446, 563 P.2d 1300 (1977). As MILP does here, in *Neiffer*, the appellant contended that an option provision in a lease did not contain sufficient terms and conditions necessary for the sale of the property and that, accordingly, the option was unenforceable. 17 Wn. App. at 446. Because this issue was raised for the first time on appeal, however, we determined that we would not consider the appellant's contention. *Neiffer*, 17 Wn. App. at 446.

rules will apply harmoniously. *See Hedlund*, 110 Wn. App. at 188-89. At oral argument, MILP's counsel indicated his belief that the requirements of CR 8(b) and CR 15(b) are meaningless where a party seeks to raise as error the failure to prove essential facts pursuant to RAP 2.5(a)(2). We disagree, however, that in promulgating RAP 2.5(a)(2), our Supreme Court intended to render nullities these basic rules of pleading. Indeed, by its own language, RAP 2.5(a)(2) pertains only to issues that must be established by proof of particular facts at trial. Where no proof of such facts is required in order to obtain relief, the rule is simply inapplicable. If "relief can be granted" despite the absence of particular facts, an appellant cannot thereafter invoke RAP 2.5(a)(2) in order to argue for the first time on appeal that such facts were not established.

¶37 Here, having indicated in its answer that the option contract's enforceability was not a contested issue in the case, MILP cannot be heard to complain on appeal that the facts necessary to demonstrate a valid contract were not established at trial. Given the pleadings, the various motions of the parties, and the way the case was actually tried, no proof of "mutual assent" was necessary for MRA to obtain relief on its breach of contract claim. *See Yarnell*, 66 F.R.D. at 423. The question of the contract's validity had been definitively resolved, and no proof of facts demonstrating its enforceability was necessary. Accordingly, RAP 2.5(a)(2) is inapplicable and, thus, MILP has not demonstrated an entitlement to appellate review.

### B

¶38 Even had MILP denied the validity of the option agreement in its answer, given the language of the contract, we perceive no error in the trial court's decision to enforce it. MILP contends that the parties failed to reach mutual assent with regard to the material term of the facility's price and that, accordingly, the option agreement was an

unenforceable "agreement to agree." In support of this contention, MILP points to the trial court's finding that there was no "meeting of the minds with respect to what was to be included in determining replacement cost for the facility." However, the option agreement expressly contemplated circumstances in which replacement cost would not be considered when determining a purchase price. Indeed, even in the absence of replacement cost, the contract provided a specific, detailed mechanism for determining the purchase price of the facility. Given that the parties expressly agreed to these terms, MILP's contention is without merit.

¶39 In order for a valid contract to form, the parties must objectively manifest their mutual assent to the essential terms of the contract. *Yakima County Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388, 858 P.2d 245 (1993). The essential terms of an option contract for a sale of land include the parties, a description of the property, and a means for determining the purchase price. *Neiffer v. Flaming*, 17 Wn. App. 443, 446, 563 P.2d 1300 (1977) (citing *Valley Garage, Inc. v. Nyseth*, 4 Wn. App. 316, 481 P.2d 17 (1971)).

¶40 Here, the option agreement stipulated that the facility's purchase price would be the greater of the facility's "fair market value," "replacement cost," or "prospective fair market value" set forth in Schedule D. MILP contends that the plain language of the agreement required that each of these three valuation methods be considered in determining the final purchase price and that, accordingly, the trial court's finding that there was "no meeting of the minds" with respect to the meaning of "replacement cost" equates to a determination that the parties failed to mutually assent to the essential term of the facility's price.[11] Thus,

---

[11] MILP further contends that the trial court's finding that there was no meeting of the minds regarding whether to include the value of MRA's business when determining the facility's fair market value also renders this pricing method unenforceable. However, this finding applied only to the question of whether the

MILP asserts, the option contract is unenforceable. We disagree.

¶41 Contrary to MILP's assertion, the option agreement did not require that all three pricing methods be utilized in determining the facility's final purchase price. Rather, the agreement contemplated that as few as one of the pricing methods could be sufficient. In order for either "fair market value" or "replacement cost" to apply, the parties were required to take timely, proactive steps. The agreement specified that if MILP and MRA were unable to agree upon a "fair market price" within 15 days of MRA's exercise of its option, then each party would be granted 5 additional days to appoint a disinterested appraiser to assess fair market value. MILP's selection of a disinterested appraiser to assess "replacement cost" was likewise to occur pursuant to this procedure.[12] In the event that no disinterested appraiser was selected by either party within the 5-day period, the purchase price would be determined solely by Schedule D, which set forth the "prospective fair market value" of the facility. Accordingly, MILP is incorrect that the

---

parties had agreed to include one particular factor among many that might be included when assessing fair market value. In contrast to the trial court's evaluation of "replacement cost," the court did not determine that this pricing method could not be given effect.

[12] The option agreement stipulated that "[r]eplacement cost shall be determined by the appraiser selected by MILP pursuant to the next succeeding paragraph, and shall be the amount included in the appraiser's appraisal report on the Facility." The next succeeding paragraph stipulated:

MILP and MRA shall within five (5) days and the expiration of the fifteen (15) day period each promptly appoint an [sic] disinterested appraiser who is a member of the American Institute of Real Estate Appraisers (or any successor organization thereto) experienced in the appraisal of facilities like that of the Facility. The appraisers appointed, shall, within thirty (30) days after the date of the notice appointing the first appraiser, proceed to appraise the Facility to determine the Fair Market Value thereof as of the relevant date (giving effect to the impact, if any, of inflation from the date of their decision to the relevant date); provided, however, that if only one (1) appraiser shall have been so appointed, or if two (2) appraisers shall have been appointed but only one (1) such appraiser shall have made such determination within thirty (30) days after the appointment of the first appraiser, then the determination of such appraiser shall be final and binding upon the parties.

purchase price of the facility could not be determined in the absence of an evaluation of replacement cost.

¶42 Moreover, the option agreement expressly contemplated circumstances in which certain of its provisions might be found unenforceable. A broad severability clause provided that "[t]he invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted." Pursuant to this provision, the contract remained enforceable even after the pricing method based upon replacement cost was stricken. Indeed, even if both fair market value and replacement cost were severed from the agreement, the remaining contract would retain a valid method for determining the facility's price: namely, Schedule D of the option agreement.[13]

¶43 Under the broad severability provision of the option agreement, the pricing method based upon replacement cost was properly severed from the contract. The remaining agreement set forth all the essential terms of a valid option contract, including a sufficient mechanism for determining the purchase price. The trial court did not err by enforcing this agreement.

---

[13] Furthermore, in this case, the trial court determined that MILP's appraiser, James Brown, was not a disinterested appraiser and that, accordingly, all of its opinions must be disregarded. The court explained that Aaron Brown, the appraiser assigned to evaluate the facility, had "abandoned his own independence and integrity" by following MILP's directions to change his final report. The trial court further noted that Brown had repeatedly violated the standards of professional appraisal practice, changed his assessment of construction quality in order to increase the facility's valuation, ignored his own inspector's report of water damage and construction defects, and arbitrarily backdated his report from September 24, 2008 to June 15, 2008. Contrary to MILP's assertion at oral argument, these actions by Brown related not only to the determination of fair market value but also to the determination of replacement cost.

Accordingly, no disinterested appraiser was timely appointed by MILP to calculate the facility's fair market value and replacement cost. As the trial court noted, in such circumstances, it would be appropriate to rely solely upon Schedule D in setting the purchase price for the facility. Thus, based upon the facts of the case as well, the trial court properly determined that replacement cost was not a valid measure upon which to base the facility's valuation.

¶44 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

LEACH, C.J., and SCHINDLER, J., concur.

Reconsideration denied October 22, 2013.

Review denied at 179 Wn.2d 1025 (2014).