[No. 16226-5-III.   Division Three.   March 31, 1998.]

*In the Matter of the Estate of* DIANA CRICHTON MARKS.

HARTWELL MARKS, *Appellant*, v. THE ESTATE OF DIANA CRICHTON MARKS, ET AL., *Respondents*.

*Steven W. Hughes* of *Woodard & Hughes*, for appellant.

*William J. Schroeder, Simon R. Collins,* and *Mary M. Palmer* of *Paine, Hamblen, Coffin, Brooke & Miller,* for respondents.

KURTZ, J. — Hartwell Marks, Diana Marks' brother, contests the validity of her will. Ms. Marks was assisted in preparing her will by her friends, Eldon and Judith Blan-

ford. The Blanfords, and a religious organization controlled by them, were named as substantial beneficiaries in the will. Mr. Blanford was named personal representative. The court found no undue influence was exerted upon Diana Marks. However, the court found the Blanfords engaged in the unauthorized practice of law, voided the gifts to them and the religious organization, and removed Mr. Blanford as personal representative. The court awarded the Blanfords their fees from the estate, and denied Hartwell Marks his fees. We affirm the judgment of the trial court.

## FACTS

Diana Crichton Marks was a professor at Whitworth College until her retirement in 1990. She was a devout Christian who taught Sunday School for several churches. In the mid-1980s, she began attending the Christian Life Center (now Christian Life Church). After joining the church, Ms. Marks was asked to teach Sunday School. Sometime in 1986-87, she was asked if she would take the pulpit on an interim basis. Eventually, she took over on a full-time basis and was ordained by the church. This ministry was very important in Ms. Marks' life, and her life revolved around the church.

In 1989, Hartwell Marks, Ms. Marks' brother, and his family moved into Ms. Marks' home after he lost his home due to financial problems. Mr. Marks had not been gainfully employed for several years while he unsuccessfully attempted to develop an exercise bicycle. It was understood that Mr. Marks and his family would stay for approximately six weeks while they looked for a new place to live.

Mr. Marks and his family remained in Ms. Marks' home for three years, until Ms. Marks asked them to leave. Mr. Marks claims that he left his sister's home on good terms; other witnesses indicate that when Ms. Marks asked Mr. Marks to leave, he became extremely angry. After Mr. Marks left his sister's home, they did not visit, see, speak or write to each other, even after Mr. Marks had a stroke,

and even though they both lived in Spokane less than six miles apart. Mr. Marks never returned to the Christian Life Church. Ms. Marks did not advise her brother of her medical condition prior to her death.

In September 1994, Ms. Marks was admitted to Sacred Heart Medical Center in Spokane complaining of fatigue and swelling in her lower extremities. Soon thereafter, she was referred to an experimental cancer program at the University of Washington. Because the treatment, after initial surgery, would be on an outpatient basis, Ms. Marks made arrangements with her friends, Eldon and Judith Blanford, to stay in their home near Seattle. Ms. Blanford, who was in Spokane visiting an ill relative, offered to assist Ms. Marks by accompanying her on the flight to Seattle.

The evening before her surgery, scheduled September 14, Ms. Marks discussed her situation with Ms. Blanford. Reportedly, she stated that she was not afraid to die, but she said, "I'm afraid of all the things I have to do before I die," specifically referring to having to make a will. Ms. Blanford offered to contact her attorney in the morning.

On the day of the surgery, Ms. Blanford called her own attorney, who said he could not prepare a will right away, but he suggested Ms. Blanford purchase a will kit at a stationery store. Ms. Marks agreed Ms. Blanford should purchase the kit. Ms. Blanford went to the Office Depot near her home and selected the kit. Ms. Marks paid Ms. Blanford for the kit. Ms. Marks read the instructions and began to talk about what she wanted various people to receive. Ms. Blanford wrote the bequests as Ms. Marks talked. Ms. Marks then asked Ms. Blanford to call her investment counselor to obtain the information concerning all her investments.

The day after Ms. Marks' surgery, Ms. Blanford retyped the language from the will kit onto her home computer because she was unable to feed the forms through her word processing program. She filled in the information as related by Ms. Marks and gave her a draft. Ms. Marks did not make any substantive changes to the draft, but corrected some

typographical errors. Over the next couple days, Ms. Marks reviewed at least two more drafts, correcting typographical errors. When Kemsley Marks, her sister, arrived from Texas, they discussed at length the bequests under the will.

On September 20, 1994, Ms. Marks signed her Last Will and Testament before Denise Andres, an acquaintance of the Blanfords, and Ms. Andres' pastor, Rick B. Danner, Sr. The will was also witnessed by a hospital notary, Pamela Brown. During the time Ms. Marks was preparing her will, she was visited by several people, including William and Diana Lee and Gail and Larry Wolf.

Ms. Marks discussed the will with the Wolfs and rather than expressing any uncertainty, she stated she had prepared the will because "there were some members of the family who could possibly make trouble." When speaking to William and Diana Lee, she explained her testamentary plan—"her moneys," the money she made in her lifetime—would go to the "kingdom, the Lord's work." She also advised the Lees that certain family members might not be happy with her decision. The Lees observed that despite being weak, Ms. Marks remained strong-willed and resolute. She steadfastly refused physical therapy, despite persistent urgings of a physical therapist and the Lees themselves.

The will provided that Ms. Marks' home in Spokane and 50 percent of the residuary of her estate would go to her sister, Kemsley Mudie Marks. Ms. Marks left to her brother, Charles Harrison Marks, Jr., several investment accounts and stocks. She left to her developmentally disabled niece, Susan Lee Marks, her rare coin collection for purposes of Susan's long-term care. She left Hartwell Lee Marks, Hartwell Marks' son and her nephew, her car and a life insurance policy worth approximately $48,000. Ms. Marks gave Hartwell Marks a small investment portfolio and forgave him a $3,000 loan he had not repaid. Ms. Marks stated that Mr. Marks had received more than $100,000 in "documented loans" from their deceased sister, which reduced

the value of the inheritance they shared after their sister's death. Mr. Marks admits all of these statements are true, except he claims that the $100,000 plus was an "investment" and not a loan. Ms. Marks left Judy Potter, her personal secretary, some Monsanto stocks. Ms. Blanford received some diamonds. Ms. Marks left Bonnie June Harding, a longtime friend, $20,000.

The Christian Life Center was the church Ms. Marks pastored. From her estate, Ms. Marks left her church $100,000. Personal Freedom in Christ Ministries, the Blanfords' religious organization, was given $100,000. This ministry is administered on a day-to-day basis by the Blanfords. Ms. Marks was a founder of the corporation and served on its Board of Directors. Additionally, Ms. Marks gave Faith Family Church $25,000 to be used for the purpose of providing the salaries of Jim Buehl and his wife, the church's pastors. Ms. Marks had met the Buehls several times, had ministered at the church on a few occasions, was aware that the church was unable to pay the Buehls' salaries, and was also aware that the Buehls were in financial need. Finally, Ms. Marks made a specific bequest to the Mission's Fund of the Christian Life Center, the financial arm of the Christian Life Church charged with missionary work.

The September 20, 1994, will of Diana Crichton Marks, which is the subject of this action, was admitted to probate on October 11, 1994. On November 23, 1994, Hartwell Marks filed a petition, amended September 25, 1995, contesting the validity of the will and seeking an order appointing him substitute personal representative of his sister's estate. Mr. Marks claimed the will was invalid for several reasons: the will was the result of undue influence on the part of Eldon and Judith Blanford and Kemsley Marks, fraudulent misrepresentations were made by Kemsley Marks, and the will was improperly executed. By the time the case reached trial, the trial court was faced with two issues: (1) whether Ms. Marks' will was the product of fraud and undue influence, and (2) whether Eldon and Ju-

dith Blanford and Kemsley Marks engaged in the unauthorized practice of law.

The matter was tried to the court over four days, with the court considering the testimony of 19 witnesses and many exhibits. The trial court ruled that the September 20, 1994, will was not a product of undue influence or fraud and was valid. Nevertheless, the court found that Eldon and Judith Blanford had unwittingly engaged in the unauthorized practice of law while assisting Ms. Marks in the preparation of her will and, as a matter of public policy, Judith Blanford must be divested of her bequest, and the Personal Freedom in Christ Ministries, of which the Blanfords are the principal administrators, must be divested of its bequest. The trial court removed Eldon Blanford as personal representative. The court awarded attorney fees to the Blanfords, but did not award fees to Hartwell Marks.[1] Hartwell Marks appeals.

Did the court err in finding Ms. Marks' will was not the product of undue influence?

█ A will procured by undue influence is invalid. *In re Estate of Bottger*, 14 Wn.2d 676, 699, 129 P.2d 518 (1942). Undue influence must be proven by the contestants of a will, using clear, cogent and convincing evidence. *In re Estate of Reilly*, 78 Wn.2d 623, 639, 479 P.2d 1, 48 A.L.R.3D 902 (1970). Influence becomes undue only when it overcomes the will of the testator, when the act of making the will is the result of such coercion that free agency is destroyed. *Bottger*, 14 Wn.2d at 700. Not every influence exerted over a person can be characterized as undue influence. Generally, influence exerted by giving advice, arguments, persuasions, solicitations, suggestions or entreaties is not considered undue unless it be so importunate, persistent or coercive and operates to subdue and subordinate the will of the testator and take away his or her freedom of action. *Reilly*, 78 Wn.2d at 662. The factors examined by

[1]The court's award of fees to the Blanfords is not readily apparent in the appellate record. However, because the parties both agree there was such an award, we will address the matter herein.

the court are whether the beneficiary (1) occupied a fiduciary or confidential relationship with the testator; (2) actively participated in the preparation or procurement of the will; and (3) received an unusually or unnaturally large part of the estate. *Dean v. Jordan*, 194 Wash. 661, 672, 79 P.2d 331 (1938). The court will also consider the age and condition of the testator, the nature of the relationship to the beneficiaries, the opportunity for exerting undue influence and the naturalness of the disposition. *Id.*

Here, seven witnesses testified during the petitioner's case in chief. These witnesses included Hartwell Marks' wife (Virginia), Mary Lockie, Judith Blanford, Kemsley Marks, Eldon Blanford, Joseph P. Delay and Hartwell Marks. None of these witnesses testified to acts that would constitute undue influence. The testimony indicated Ms. Marks was a generous woman, prone to intense involvement with various causes or organizations. These causes would change from time to time in her life. Near her death, Ms. Marks was deeply involved in her religious ministries, and experienced a deepened relationship with the Blanfords. They took her into their home and cared for her while she was ill. The evidence indicates the Blanfords showed Diana Marks many acts of kindness, but exerted no undue influence over the dispositions contained in her will.

While Kemsley Marks testified she did not approve of her brother Hartwell, she did not appear to try to influence or persuade Ms. Marks to reduce the bequest to him. Kemsley Marks testified Diana had already written the provision regarding Hartwell and read it to her over the telephone before she flew up to Seattle to be with her sister. After she arrived, they discussed Diana's proposed disposition. The will was not substantively changed after Kemsley's arrival and the discussions. The evidence supports the conclusion that Diana Marks' disposition was not unduly influenced by Kemsley Marks.

Hartwell Marks has failed to show by clear, cogent and convincing evidence the Blanfords or Kemsley Marks exercised undue influence over Diana Marks in the cre-

ation of her will. Sufficient evidence exists supporting the court's conclusion that the will was not the product of undue influence. The court committed no error.

If a will is the product of the unauthorized practice of law, is the entire will rendered invalid?

██ ██ The unauthorized practice of law is generally acknowledged to include " 'not only the doing or performing of services in the courts of justice, throughout the various stages thereof, but in a larger sense includes legal advice and counsel and the preparation of legal instruments by which legal rights and obligations are established.' " *Hagan & Van Camp, P.S. v. Kassler Escrow, Inc.*, 96 Wn.2d 443, 446-47, 635 P.2d 730 (1981) (quoting *Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n*, 91 Wn.2d 48, 54, 586 P.2d 870 (1978)). The selection and completion of preprinted form legal documents is also deemed the "practice of law." *Id.* at 447.

██ Here, the court found the Blanfords' activities in selecting a will kit, discussing the distribution of assets and whether it was fair, obtaining the inventory of investments, typing the will, and arranging for the signing and witnessing of the will constituted the unauthorized practice of law.

██ The rules regulating the conduct of lawyers are applicable to lay people who engage in the practice of law. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 587, 675 P.2d 193 (1983) (citing *Burien Motors, Inc. v. Balch*, 9 Wn. App. 573, 578, 513 P.2d 582 (1973), *review denied*, 83 Wn.2d 1005 (1974)). The Rules of Professional Conduct govern the conduct of lawyers and in part prohibit a lawyer from preparing

> an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee.

RPC 1.8(c). Because a lawyer preparing Ms. Marks' will could not have designated himself or herself a beneficiary,

the Blanfords are also precluded from doing so. The trial court voided the gifts to the Blanfords and their religious organization, and it also removed Eldon Blanford from the position of personal representative. In construing a will, the paramount duty of the court is to give effect to the testator's intent. *In re Estate of Bergau*, 103 Wn.2d 431, 435, 693 P.2d 703 (1985). Because the trial court found no evidence warranting avoidance of the entire will, and recognizing its duty to honor Ms. Marks' intent, the court voided only the portions relating to the Blanfords. The court correctly invalidated only the portions of the will relating to the bequests to the Blanfords and their personal religious organization.

Did the court err in awarding attorney fees to Eldon Blanford from the estate?

■ RCW 11.24.050 governs the award of attorney fees and costs in a will contest. If the probate is revoked or the will annulled, assessment of costs is in the discretion of the court. RCW 11.24.050. The test used in determining whether a deposed executor is entitled to recover attorney fees from the estate is whether the executor acted in good faith. *In re Estate of Kleinlein*, 59 Wn.2d 111, 115, 366 P.2d 186 (1961). A conclusion of undue influence perpetrated by an executor and beneficiary in a will contest imports a finding of bad faith. *In re Estate of Pfleghar*, 35 Wn. App. 844, 848, 670 P.2d 677 (1983), *review denied*, 100 Wn.2d 1036 (1984). Here, the court found no undue influence was exerted by the Blanfords.

Hartwell Marks argues that because the Blanfords engaged in the unauthorized practice of law, they acted in bad faith. Bad faith is defined as " ' "actual or constructive fraud" or a "neglect or refusal to fulfill some duty . . . not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." ' " *Bentzen v. Demmons*, 68 Wn. App. 339, 349 n.8, 842 P.2d 1015 (1993) (quoting *State v. Sizemore*, 48 Wn. App. 835, 837, 741 P.2d 572, *review denied*, 109 Wn.2d 1013 (1987)). Here, no evidence of fraud or neglect exists. Rather, the Blanfords

made an honest mistake as to the extent of their abilities to assist Diana Marks in drafting her will. The trial court specifically found the Blanfords engaging in the unauthorized practice of law did not constitute bad faith. The court did not abuse its discretion in awarding fees to Eldon Blanford from the estate.

Did the trial court err by refusing to award Hartwell Marks his attorney fees from the estate?

▪ The trial court declined to award Hartwell Marks his attorney fees. Appellate courts will not interfere with an allowance of attorney fees in probate matters unless there are facts and circumstances clearly showing an abuse of the trial court's discretion. *In re Estate of Larson*, 103 Wn.2d 517, 521, 694 P.2d 1051 (1985).

First, the court concluded RCW 11.96.140 did not apply to this action. Fees were not awarded under RCW 11.68.070 because Eldon Blanford was not removed for misconduct, or breach of the duties of personal representative. Finally, fees were not awarded under the common fund doctrine because the personal representative, Timothy Mackin, found the estate had not financially benefited from the litigation.

▪ Hartwell Marks argues he is entitled to attorney fees under RCW 11.24.050. However, that provision states where a will is upheld in a contest, the court may assess fees against the contestant, if he or she did not act in good faith. RCW 11.24.050 does not provide an award of fees to the unsuccessful contestant from the estate and, thus, the court correctly refused to award fees.

▪ RCW 11.68.070 allows the court to award attorney fees if a personal representative is removed for misconduct. No evidence was introduced of misconduct by Eldon Blanford as personal representative. Rather, Mr. Blanford was removed because of the acts undertaken by him and his wife prior to and during the drafting of Diana Marks' will. The court properly refused to award fees under this statute.

■■■ The court also refused to award fees under RCW 11.96.140, which provides:

> Either the superior court or the court on appeal, may, in its discretion, order costs, including attorneys' fees, to be paid by any party to the proceedings or out of the assets of the estate . . . as justice may require.

The trial court concluded this was a generalized statute which did not apply to this action. RCW 11.96 sets forth a statutory scheme governing an interested party's rights under a will or trust. RCW 11.24 specifically governs will contests, as was presented by this case. *See Bentzen,* 68 Wn. App. at 349 n.8 (RCW 11.96.140 does not apply to will contests). As such, the court correctly ruled RCW 11.96.140 did not apply.

■■■ Finally, the court refused to award Hartwell Marks attorney fees under the "common fund doctrine." The common fund doctrine is a recognized ground in equity for granting attorney fees. *Bowles v. Department of Retirement Sys.,* 121 Wn.2d 52, 70, 847 P.2d 440 (1993). Under this theory, attorney fees are authorized only when the litigants preserve or create a common fund for the benefit of others as well as themselves. *Id.* at 70-71.

The court reserved its ruling regarding the common fund until the personal representative issued a report regarding the litigation benefit to the estate. In the Second Interim Report of Tim J. Mackin, Administrator De Bonis Non with Will Annexed, Mr. Mackin concluded the net probate estate did not increase as a result of the litigation, but rather the result was the shifting of distribution of assets. He further noted the litigation did serve to benefit the Mission's Fund of Christian Life Center, which was the beneficiary of all undistributed assets. Absent the litigation, the Mission Fund would have received nothing from the estate.

Here, Hartwell Marks' litigation was marginally successful. He did not ultimately prevail in his attempt to have the will declared void. Nor did Mr. Marks benefit himself by the litigation. The other beneficiaries chose not to join

Mr. Marks in his suit contesting the will. The court's refusal to force these beneficiaries to fund Mr. Marks' suit is not unreasonable nor an abuse of discretion.

The judgment of the trial court is affirmed.

SCHULTHEIS, C.J., and BROWN, J., concur.

Reconsideration denied June 9, 1998.

Review denied at 136 Wn.2d 1031 (1998).