# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Estate of:<br>MARY-LOUISE KORSTEN,<br><br>Deceased,<br><br>LOUANNE MARIE WHEELER,<br><br>Appellant,<br><br>v.<br><br>MARIANNE V. RIOS, Personal Representative<br>of the Estate of Mary-Louise Korsten,<br><br>Respondent. | No.  54454-7-II<br><br><br><br><br><br>UNPUBLISHED OPINION |

SUTTON, J. — Louanne Marie Wheeler filed a petition contesting the will admitted for the probate of the estate of her mother, Mary-Louise Korsten.  The trial court denied Wheeler's petition.  Wheeler appeals the order dismissing her will contest with prejudice.

Wheeler argues that the trial court erred by determining that Korsten had the capacity to execute a will in July 2012 and by finding that Marianne V. Rios, the personal representative for Korsten's estate, presented sufficient evidence to overcome the presumption of undue influence. Both Wheeler and Rios request an award of appellate fees and costs.

We hold that the trial court did not err by dismissing Wheeler's will contest with prejudice and we affirm the trial court's order.  We grant Rios' request for an award of reasonable appellate attorney fees and costs and we deny Wheeler's request for appellate fees and costs.

No. 54454-7-II

FACTS

I. BACKGROUND

A. INITIAL WILL

A. Eugene Hammermaster had been Korsten's attorney for more than 20 years and had represented her and her husband in a number of legal matters. In 1992, he prepared, and Korsten and her husband executed, the "Louanne Korsten Serjeant Trust." Clerk's Papers (CP) at 146. In 1993, Hammermaster prepared a will that Korsten executed. Under the 1993 will, the Korsten estate would be equally distributed between the children: Jack Korsten and Louanne Wheeler.

In 1994, Hammermaster prepared a codicil that Korsten executed modifying the distribution scheme of the 1993 will by reducing the bequest to Wheeler by half and directing that Jack, as trustee, hold onto it until Wheeler reached the age of 55 years. Under the term of the 1994 codicil, the other half of Wheeler's inheritance was devised to Jack, as trustee, to use for charitable purposes. In 1998, Korsten's husband died and Hammermaster handled the probate of his will and assisted with the administration of the estate.

B. LAWSUIT AND INVESTIGATION

In August 2009, Korsten executed a durable power of attorney that appointed Jack and Wheeler as agents, each independent of the other. In September 2009, Korsten revoked Wheeler's power of attorney after learning that Wheeler improperly used the authority granted to her under the power of attorney in an attempt to withdraw approximately $800,000 from Korsten's bank account. Jack remained as the sole agent.

Shortly after the attempted withdrawal, Wheeler met with Hammermaster and informed him that she only meant to borrow the money to purchase a house and claimed that she would

2

repay the loan using the proceeds from a pending lawsuit. Hammermaster looked into the lawsuit she mentioned, found none, and advised Korsten against giving Wheeler the loan. No loan was made.

In October 2009, Korsten executed a new durable power of attorney naming Jack as the sole authorized agent.

In June 2010, Korsten executed a new durable power of attorney naming Wheeler as the sole authorized agent, because Jack had used his authority to transfer approximately $500,000 from Korsten's bank account into his own. In September 2010, Korsten terminated the Louanne Korsten Serjeant Trust and Wheeler received the trust assets, which included a residence, real property, and over $250,000 in an investment account.

The trial court found that Korsten's medical records from 2010 indicated that she probably had "early Alzheimer's dementia" and that she was taking five milligrams of Aricept, "a drug that is often prescribed to improve cognition and behavior of people with dementia." CP at 151. An increased dosage was recommended, but never implemented. Korsten received a "Mini Mental Status examination" in which she scored 25 out of 30 points, which meant that she had normal cognition when she took the examination. CP at 151.

In April 2011, Korsten executed a new durable power of attorney naming Jack as the sole authorized agent because Wheeler had misappropriated funds from Korsten's bank account. Korsten revoked and terminated the June 2010 power of attorney.

On April 24, 2011, Korsten informed Wheeler in front of Rios and other witnesses that she had revoked the June 2010 power of attorney and Wheeler was to stay out of her bank accounts. Following this confrontation, Wheeler was barred from returning to the assisted living facility

where Korsten resided. On April 27, 2011, Wheeler, using the June 2010 power of attorney, withdrew $55,000 from Korsten's bank account.[1]

Because of Wheeler's unauthorized withdrawal, a complaint was filed with the Sumner Police Department. Wheeler presented evidence that she later returned the money. Korsten did not again make Wheeler her agent under her power of attorney.

C. REVISED WILL

Korsten revised her will in July 2012, and the revision was witnessed by Jami Pitman and Amanda Wenz, who were employees at the assisted living facility where Korsten resided. The 2012 will disinherited Wheeler and replaced her with Rios.

The trial court found that "four days after Mrs. Korsten executed her 2012 [w]ill, records from the . . . facility where Mrs. Korsten was residing noted '[e]vidence of short term memory loss,' [and] that Mrs. Korsten 'is not oriented to . . . time,' and that her '[a]bility to make decisions about daily life is poor, requires reminders, cues, and supervision in planning daily routines.'" CP at 153 (some alterations in original). Korsten passed away in 2013 and the 2012 will was admitted to probate shortly thereafter. Rios was appointed as the personal representative after Jack declined to serve.

---

[1] The trial court's findings of fact indicate that Wheeler made this withdrawal on April 27, 2010, but Hammermaster's uncontested testimony was that Wheeler withdrew the $55,000 on April 27, 2011. Wheeler had been granted a power of attorney on June 11, 2010 (which Korsten later revoked). Therefore, the withdrawal could not have happened on April 27, 2010, because Wheeler used the June 11, 2010 power of attorney to make the withdrawal. Thus, we treat this as a scrivener's error and presume the withdrawal occurred on April 27, 2011.

The trial court found that "[t]he revisions Mrs. Korsten made in her 2012 [w]ill were a radical departure from a prior testamentary scheme; despite the reduction in Mrs. Wheeler's testamentary share earlier, the 2012 will disinherited her entirely." CP at 155.

## II. PROCEDURAL HISTORY

### A. LAWSUIT

Wheeler filed a petition contesting the validity of the 2012 will. The case proceeded to a bench trial.

### B. TRIAL

A number of people testified at trial regarding Korsten's testamentary capacity and the nature of the relationship between Korsten and Rios.

#### 1. Jami Pitman

Jami Pitman, the resident care coordinator at the care facility where Korsten resided, testified that she drafted Korsten's care plans. As the resident care coordinator, Pitman worked with a registered nurse and the family of a resident to develop a care plan that met "the resident's needs and the family's wants" on a quarterly basis. Verbatim Report of Proceedings (VRP) (Nov. 18, 2019) at 41. Regarding Korsten, Pitman testified that Korsten did not ask staff to assist her with most daily tasks. She testified that Korsten did have short-term memory loss (dementia) and took Aricept for it. Pitman testified that she witnessed Korsten sign her will in 2012; it was her impression that Korsten understood what she was doing by signing the will, she understood her property, and she understood who she was giving it to. Pitman also testified that Korsten "liked things her way and no other way. So she let her needs be known, and how she wanted things to be done." VRP (Nov. 18, 2019) at 53.

5

2. Amanda Wenz

Amanda Wenz, a registered nursing assistant at the assisted living facility, worked with Korsten and was familiar with her dementia diagnosis. She testified that while she was working with Korsten, she did not see Korsten's dementia manifest in the way that she interacted with Wenz. Wenz testified that Korsten, while hard of hearing, could communicate articulately and consistently regarding her needs. Wenz testified that she witnessed Korsten sign her will in 2012, it was her impression that Korsten understood what she was doing by signing the will and she understood what would happen to her property.

The court found that Wenz testified that "Mrs. Korsten would scrutinize the medications that Ms. Wenz would prepare for her and would notice – and comment – if one or more of her pills was missing." CP at 154.

3. Traci Mancuso

Traci Mancuso, a nurse practitioner, met with Korsten once before she executed the 2012 will. Mancuso was familiar with Korsten's dementia diagnosis, but she did not act as Korsten's primary care provider until June of 2012, approximately a month before Korsten signed her revised will. Mancuso did not believe that Korsten had "sufficient mind and memory to understand transactions, such as creating a [w]ill" when she executed the revised will in 2012. VRP (Nov. 18, 2019) at 123.

The trial court found that Mancuso "initially testified at trial that she had conducted a cognitive assessment of Mrs. Korsten . . . but … on cross-examination . . . she admitted that she had not in fact administered [an assessment], nor had she performed any other formal assessment

of Mrs. Korsten's cognitive function." CP at 153. The court also found that Mancuso was not present when Korsten signed her revised will in 2012.

### 4. Louanne Wheeler

Wheeler testified that she had not seen her mother since April 2011, when she was barred from entering the assisted living facility. She received doctors' reports about Korsten until her mother passed away.

The trial court found that Wheeler testified that Korsten's "cognitive abilities declined from late 2010 and got worse up until the time [she] passed away, although . . . Wheeler did not see Mrs. Korsten at any time after April, 2011, because the administration of the . . . assisted living facility barred [her] from coming in to that facility." CP at 151. The court also found that "Wheeler testified that she did not believe that [Korsten] had the capacity necessary to execute the [w]ill." CP at 152.

No one besides Wheeler was prevented from visiting Korsten at the assisted living facility.

### 5. Marianne Rios

Rios testified that she maintained a close relationship with her grandmother, Korsten, all of her life. She testified that she and Wheeler were not close and Wheeler and Korsten had a strained relationship. She testified that Korsten was of sound mind up until she passed away, although her hearing had worsened.

The trial court found that Rios's testimony lacked credibility when she testified that "at no time did she discuss the terms or provisions of the [w]ill with Mrs. Korsten." CP at 150. The court found that Rios "lacks all credibility on this issue. [Rios] was in the company of Mrs. Korsten

7

on a daily basis, and the change being made to Mrs. Korsten's estate was dramatic, disinheriting her daughter, while leaving her granddaughter half her estate." CP at 150. The court further found:

> Mrs. Korsten's frequent contacts with the Hammermaster law office to discuss the change in the will demonstrates it was important to her. For Mrs. Rios to assert that she knew nothing about this strains all credulity. Indeed, the evidence revealed that Mrs. Rios, and only Mrs. Rios contacted the law office in order to ensure the will was drafted. Mrs. Rios went to the law office to pick up the will and took it to her grandmother for signature. After Mrs. Korsten executed the [w]ill, Marianne Rios returned the document to Mr. Hammermaster's office.

CP at 150-51.

The trial court also found that Rios testified that she did not learn that Korsten had made her a beneficiary in the revised will until one month after Korsten had passed away. The court found that Rios's testimony on this issue also lacked credibility. Rios testified that, "while Mrs. Korsten suffered from several physical injuries and challenges such as being exceptionally hard of hearing, she retained her cognitive capabilities and was able to clearly communicate her ideas and intentions up until the time she passed away." CP at 154.

### 6. Eugene Hammermaster

Hammermaster had worked for Korsten and her late husband for the better part of thirty years. Hammermaster testified that before executing the 2012 will, Korsten had discussed disinheriting Wheeler on a number of occasions. Korsten wanted to remove Wheeler from her will because of "all of these things that had been ongoing over the past several years." VRP (Nov. 25, 2019) at 360. Hammermaster testified that in 2012 "removing [Wheeler] was her immediate intent, no question about it." VRP (Nov. 25, 2019) at 360. Rios was Korsten's next of kin and Korsten was "quite forceful" in her request for this change. VRP (Nov. 25, 2019) at 361.

8

Shortly after Korsten and Hammermaster met in 2012 to discuss these changes to the will, Hammermaster revised the will to remove Wheeler as the personal representative and replace her with Rios. Hammermaster testified that in April 2012 Korsten understood what was being done to revise her new power of attorney and update her will. He was asked several questions about Korsten's request to revise her will:

[RIOS'S COUNSEL:] Did she state why she wanted to update her [w]ill?

[HAMMERMASTER:] She wanted to take Louanne off of the [w]ill, Ms. Wheeler.

[RIOS'S COUNSEL:] And did she explain why she wanted to do that?

[HAMMERMASTER:] Partially all of these things that had been ongoing over the past several years.

. . . .

[RIOS'S COUNSEL:] Did you suggest to Mrs. Korsten that she include Marianne Rios in her [w]ill?

[HAMMERMASTER:] She told me.

[RIOS'S COUNSEL:] And did she make any other direction to you with regard to that [w]ill that you recall?

[HAMMERMASTER:] Not other than get with it and get it done. Once she had made up her mind on something, she was quite forceful in wanting to have that take place.

[RIOS'S COUNSEL:] . . . . Had Mr. or Mrs. Korsten ever spoken to you previously about disinheriting [Wheeler]?

[HAMMERMASTER:] Many times.

[RIOS'S COUNSEL:] And did they provide a basis or a reason for their desire to do that?

[HAMMERMASTER:] Her conduct primarily, and again, their concern about her management of funds as well.

VRP (Nov. 25, 2019) at 360-61.

The trail court found that "[Hammermaster] testified that he never observed Marianne Rios or any other person engage in any discussion with Mrs. Korsten regarding her estate planning or exhibit any menacing or threatening behavior directed at Mrs. Korsten." CP at 154. Following the execution of her revised will, Korsten continued to communicate with Hammermaster regarding other legal matters and Hammermaster saw nothing that would have manifested as indications of dementia or would have called Korsten's testamentary capacity into question in any way.

The trial court found that Hammermaster testified that Korsten "remained intellectually sharp in the last few years of her life" and that when Korsten conferred with him about revising her will in 2012, she knew who her family was, and was actively engaged in decision-making regarding the management and planning of her estate. CP at 153. The court also found that Hammermaster testified that he saw no indication that Rios exerted any undue influence over Korsten. The court further found that Hammermaster testified that Korsten disinherited Wheeler because she "was deeply troubled by [Wheeler's] infidelity and her repeated attempts to wrongfully appropriate Mrs. Korsten's monies." CP at 153.

Regarding Rios's influence over Korsten, the trial court found that Hammermaster testified that "he never observed Marianne Rios or any other person engage in any discussion with Mrs. Korsten regarding her estate planning or exhibit any menacing or threatening behavior directed at Mrs. Korsten." CP at 154. Rios did not attend any of Hammermaster's meetings with Korsten to discuss the revisions to her will.

C. ORDER

The trial court ultimately denied Wheeler's petition:

[T]his [c]ourt finds that petitioner, Louanne Wheeler, has failed to meet her burden of presenting clear, cogent, and convincing evidence to establish either that Mrs. Korsten lacked capacity to execute her Last Will & Testament, or that Mrs. Korsten was unduly influenced when she executed her [w]ill.

VRP (Dec. 9, 2019) at 482. The trial court entered findings of fact and conclusions of law consistent with its oral decision and the facts above.

The trial court entered the following relevant conclusions of law:

6. Because Mrs. Korsten's [w]ill was properly admitted to probate, the Petitioner in this matter, Louanne Wheeler, bears the burden of proving the [w]ill's illegality by "clear, cogent, and convincing" evidence.

7. "Clear, cogent, and convincing" evidence is a quantum of proof that is more than a preponderance of the evidence, but less than what is needed to establish proof beyond a reasonable doubt.

8. While testamentary capacity is determined as of the time the will is made, evidence related to the testator's mental condition during a reasonable time before and after the making of the will is relevant and admissible even if remoteness affects its weight.

9. Failure of memory alone is not enough to create testamentary incapacity, unless it extends so far as to be inconsistent with the sound and disposing mind and memory requisite for all wills.

10. At the time she executed her Last Will and Testament on July 2, 2012, Mary-Louise Korsten possessed testamentary capacity to execute such [w]ill.

11. At the time Mrs. Korsten sought to revise her [w]ill in the spring of 2012, Marianne Rios had a fiduciary relationship with Mrs. Korsten by virtue of the fact that Mrs. Korsten had appointed Marianne Rios as an [a]gent under the terms of Mrs. Korsten's April 20, 2012 Power of Attorney.

. . . .

16. [Rios] has conceded she had a fiduciary relationship with Mrs. Korsten, by virtue of the fact that she was her attorney-in-fact, pursuant to the Power of Attorney signed by Mrs. Korsten on April 20, 2012.

17. This court also finds that there is substantial circumstantial evidence that Mrs. Rios actively participated in the procuring of the changes [of the] will. She left messages for the law office requesting the changed will be completed, she picked up and dropped off the signed will, and as this court has already found, likely wrote the note regarding the changes to Mrs. Korsten's estate.

18. It is also true that Mrs. Rios received an unusually large part of the estate – half, after not being mentioned in previous versions of the will at all.

19. Mrs. Rios also testified that she was with her grandmother on a nearly daily basis throughout 2011 to 2013, when Mrs. Korsten died, giving Mrs. Rios the opportunity to exert undue influence. During this period, Mrs. Wheeler was excluded from [the assisted living facility], likely by a member of the family.

20. Finally, Mrs. Korsten was in her nineties, suffered from dementia and relied on others for her daily needs.

21. Having found that the facts presented here give[] rise to the presumption of undue influence, the burden shifts to [Rios] to rebut such a presumption.

22. [Rios] largely relies on the testimony of Mrs. Korsten's lawyer, Mr. Hammermaster, to rebut the presumption[.] Hammermaster testified that he saw no indication that Marianne Rios was exerting any influence – undue or otherwise – over Mrs. Korsten.

23. Mr. Hammermaster testified that Mrs. Korsten made the decision to disinherit Louanne Wheeler because Mrs. Korsten was deeply troubled by Louanne Wheeler's infidelity and her repeated attempts to wrongfully appropriate Mrs. Korsten's monies.

24. Mr. Hammermaster also testified that, in the course of drafting her 2012 [w]ill, he spoke or met with Mrs. Korsten on several occasions to get her input with regard to the terms of that [w]ill and that she was actively engaged in decision-making concerning her estate. None of those meetings included Mrs. Rios.

25. Finally, the court notes that mere influence over a person who makes changes to a last will and testament is not sufficient to invalidate the will. Rather, it is undue influence, that which is extraordinary and overcomes the free will of the testator.

26. This court has no doubt that Mrs. Rios influenced Mrs. Korsten throughout the last weeks and months of her life. In one sense that is to be expected given their closeness and the estrangement between Mrs. Korsten and Mrs. Wheeler. But the record before this court is not sufficient to find her influence was of such a nature that it can reasonably be said that Mrs. Korsten's free will was overborne by Mrs. Rios.

27. Petitioner Louanne Wheeler has failed to meet her burden of presenting clear, cogent, and convincing evidence to establish either that Mrs. Korsten lacked capacity to execute her Last Will and Testament or that Mrs. Korsten was unduly influenced when she executed her [w]ill.

CP at 156-59 (internal citation omitted).

Wheeler appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

"When reviewing a will contest, the appellate court's function is to determine whether the trial court's findings are supported by substantial evidence." *In re Estate of Barnes*, 185 Wn.2d 1, 9, 367 P.3d 580 (2016). Substantial evidence exists when there is sufficient evidence to persuade a fair-minded, rational person of the finding's truth. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). "We defer to the trial court's determinations of the weight and credibility of the evidence." *Estate of Barnes*, 185 Wn.2d at 9. "Unchallenged findings are verities on appeal." *Estate of Barnes*, 185 Wn.2d at 9. We review whether the findings of fact are supported by substantial evidence and if so, whether the findings support the conclusions of law. *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011). "Whether the facts rise to the level of undue influence that is sufficient to invalidate a will is a question of law that [this court] review[s] de novo." *Estate of Barnes*, 185 Wn.2d at 9.

## II. TESTAMENTARY CAPACITY

Wheeler argues that substantial evidence does not support the court's findings of fact and the findings do not support the court's conclusion that Korsten had testamentary capacity to revise her will in 2012, particularly given the sudden disinheritance of Wheeler. We disagree and hold that there is substantial evidence to support the trial court's finding that Korsten had testamentary capacity to revise her will in 2012.

### A. CHALLENGED FINDINGS OF FACT

Wheeler argues that the trial court's findings about Korsten's testamentary capacity are not supported by substantial evidence and the findings do not support the court's conclusions of law. She challenges portions of findings of fact 51-54 and 56, which state:

> 51. . . . Mrs. Korsten remained intellectually sharp in the last few years of her life and that at the time she was conferring with Mr. Hammermaster with regard to the revisions he was making to her [w]ill, . . . and she was actively engaged in decision-making both with regard to the management of her estate and with regard to her estate planning.

> 52. Mr. Hammermaster also testified that, in the course of drafting her 2012 [w]ill, he spoke or met with Mrs. Korsten on several occasions to get her input with regard to the terms of that [w]ill and that she was actively engaged in decision-making concerning her estate.

> 53. Mr. Hammermaster also testified that he saw no indication that Marianne Rios was exerting any influence – undue or otherwise – over Mrs. Korsten.

> 54. . . . Mrs. Korsten made the decision to disinherit Louanne Wheeler because Mrs. Korsten was deeply troubled by Louanne Wheeler's infidelity and her repeated attempts to wrongfully appropriate Mrs. Korsten's monies.

> . . . .

> 56. . . . Mrs. Korsten was as sharp and attentive as ever and understood what she was doing when she executed her 2012 [w]ill.

CP at 153-54; Br. of Appellant at 17-18.

A person has testamentary capacity if, at the time he or she executes their will, they have "sufficient mind and memory to understand the transaction in which [they are] then engaged, to comprehend generally the nature and extent of the property which constitutes [their] estate and of which [they are] contemplating disposition, and to recollect the objects of [their] bounty." *In re Bottger's Estate,* 14 Wn.2d 676, 685, 129 P.2d 518 (1942); *In re Estate of Kessler,* 95 Wn. App. 358, 371, 977 P.2d 591 (1999).

Wheeler argues that the trial court based its determination that Korsten had testamentary capacity to revise her will in 2012 on the testimony of Pitman, Wenz, and Hammermaster. Br. of App. at 18-19. Wheeler argues the court relied primarily on Hammermaster, who she claims "did not have sufficient foundation to speak as to whether Mrs. Korsten knew the extent of her property and family." Br. of Appellant at 17-18. Instead, Wheeler relies on the testimony by Mancuso, Korsten's primary care provider at the facility, who reported that Korsten had confusion and memory loss and had been diagnosed with dementia.

The trial court's findings regarding the credible testimony of Pitman and Wenz, who witnessed Korsten revised her will in 2012, are supported by substantial evidence and we do not reweigh credibility determinations. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994). Pitman, the resident care coordinator, testified that she drafted Korsten's care plans. Pitman testified that Korsten did not ask staff to assist her with most of her daily needs. She testified that Korsten had short-term memory loss and took Aricept for it. Pitman testified that she witnessed Korsten sign her will in 2012 and it was her impression that Korsten understood what she was doing by signing the will, she understood her property, and she understood who she was

15

giving it to. Pitman also testified that Korsten liked things done in her own way and she communicated her needs and how she wanted things done.

Wenz, a registered nursing assistant, worked with Korsten and was familiar with her dementia diagnosis. Wenz testified that Korsten, while hard of hearing, could communicate articulately and consistently regarding her needs. Wenz testified that she witnessed Korsten sign her will in 2012. It was her impression that Korsten understood what she was doing by signing the will, she understood her property, and who she was giving it to.

Similarly, Hammermaster's testimony is consistent with the testimony of Pitman's and Wenz's assessments about Korsten's competency when she revised her will in 2012. Hammermaster had represented her and her husband for more than 20 years. At trial, he testified that over the long course of representing her, he had many discussions with Korsten about revising her will and in 2012, she clearly directed him to prepare a revised will that disinherited Wheeler, based on her repeated and wrongful appropriation of Korsten's funds. Hammermaster observed no change in Korsten's demeanor throughout the lengthy time he worked for her. He believed that "the 2012 [w]ill express[ed] Mrs. Korsten's wishes with regard to distribution of her estate upon her death." VRP (Nov. 25, 2019) at 367.

The court also found that Mancuso initially testified that "she had conducted a cognitive assessment of Mrs. Korsten . . . but when on cross-examination . . . she admitted that she had not in fact administered [an assessment], nor had she performed any other formal assessment of Mrs. Korsten's cognitive function." CP at 153. Mancuso was not present when Korsten signed her revised will in 2012. Mancuso testified that Korsten did not have "sufficient mind and memory to understand transactions, such as creating a [w]ill" when she executed the revised will in 2012.

VRP (Nov. 18, 2019) at 123. Mancuso became Korsten's primary care provider one month prior to Korsten's execution of the revised will, had only met with Korsten one time prior to the execution of the will, and did not witness the will signing.

Because Pitman, Wenz, and Hammermaster testified as to their familiarity with Korsten before the execution of her will and averred that she was competent at the time she revised her will, the trial court could weigh the credibility of each and reasonably determine to rely on their testimony. Furthermore, contrary to Wheeler's contention that the trial court erred by relying on Hammermaster's testimony rather than Mancuso's, the testimony that Hammermaster provided at trial demonstrated that he had known Korsten much longer than Mancuso, knew her demeanor before execution of the will, and observed no change in her behavior. Therefore, the trial court could determine to weigh his testimony more heavily than Mancuso's as Mancuso was Korsten's primary care provider for only a month before she revised her will and had met Korsten on only one occasion. Additionally, because the testimony by Pitman, Wenz, and Hammermaster supported that Korsten understood the transaction in which she engaged, understood the nature and extent of her property, and understood to whom she gave the property, substantial evidence supports the court's finding that Korsten was competent and had the testamentary capacity to execute and revise her will in 2012. Because a fair-minded, rational person would determine, based on the above evidence, that Korsten was of sound mind when she executed her 2012 will, we hold that the trial court's findings of fact numbers 51-54 and 56 are supported by substantial evidence.

B. CHALLENGED CONCLUSION OF LAW

Wheeler argues that these findings do not support conclusion of law number 10, which states: "At the time she executed her Last Will and Testament on July 2, 2012, Mary-Louise Korsten possessed testamentary capacity to execute such [w]ill." CP at 157. Wheeler argues that the trial court erred by determining Korsten had the capacity to execute the 2012 will, because she was diagnosed with dementia. But these findings do support the conclusion that Korsten was of sound mind when she revised her will in 2012. Wheeler's argument, that Korsten lacked competency to execute her will in 2012, fails.

III. UNDUE INFLUENCE

We next address Wheeler's argument regarding Rios's rebuttal of the presumption of undue influence. Wheeler argues that the trial court failed to cite any other evidence other than Hammermaster's testimony, and failed to enter proper findings to support its conclusion that Rios rebutted the presumption of undue influence. And instead, she notes that the court found that Rios's testimony lacked all credibility and her testimony was completely self-serving. Therefore, Wheeler argues that the trial court erred by dismissing her petition with prejudice and the order should be reversed. We disagree and hold that Wheeler failed to meet her burden of proving by clear, cogent, and convincing evidence that Rios unduly influenced Korsten. We further hold that the court's findings are supported by substantial evidence and they support the conclusion that Wheeler failed to prove that Rios unduly influenced Korsten and thus, the court did not err by dismissing Wheeler's petition with prejudice.

"The right to testamentary disposition of one's property is a fundamental right protected by law." *Estate of Barnes*, 185 Wn.2d at 9. "A will that is executed according to all legal

formalities is presumed valid." *Estate of Barnes*, 185 Wn.2d at 9; RCW 11.24.030. "Nevertheless, a will executed by a person with testamentary capacity may be invalidated if 'undue influence' existed at the time of the testamentary act." *Estate of Barnes*, 185 Wn.2d at 9. "'Undue influence' that is sufficient to void a will must be 'something more than mere influence but, rather, influence which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.'" *Estate of Barnes*, 185 Wn.2d at 10 (internal quotation marks omitted) (quoting *In re Estate of Lint*, 135 Wn.2d 518, 535, 957 P.2d 755 (1998)).

A. ESTABLISHING THE PRESUMPTION OF UNDUE INFLUENCE

"When challenging the validity of a will, the will contestant bears the burden of proving the will's illegality by 'clear, cogent, and convincing' evidence." *Estate of Barnes*, 185 Wn.2d at 10 (quoting *Dean*, 194 Wn.2d at 671). "'[C]lear, cogent, and convincing' evidence is a quantum of proof that is more than a preponderance of the evidence, but less than what is needed to establish proof beyond a reasonable doubt." *Mueller*, 185 Wn.2d at 10 n.5 (quoting *Bland v. Mentor*, 63 Wn.2d 150, 154, 385 P.2d 727 (1963)). "If the presumption is raised, the will proponent must produce evidence to rebut the presumption." *Estate of Barnes*, 185 Wn.2d at 10. "The absence of rebuttal evidence may be sufficient to set aside a will, but the contestant retains the ultimate burden of proof." *Estate of Barnes*, 185 Wn.2d at 10. The parties do not dispute that the presumption of undue influence was raised in this case.

B. EFFECT OF THE PRESUMPTION OF UNDUE INFLUENCE

Here, the court found that Rios rebutted the presumption of undue influence, and thus, Wheeler had the ultimate burden of proof to establish the illegality of the will. "Whether or not

the presumption of undue influence is established or rebutted, the will contestant bears the ultimate burden of proving the will's illegality by 'clear, cogent, and convincing' evidence." *Estate of Barnes*, 185 Wn.2d at 16 (quoting *Dean,* 194 Wash. at 671). Our Supreme Court has "long recognized that circumstantial evidence alone can be sufficient to support a finding of undue influence." *Estate of Barnes*, 185 Wn.2d at 16. However, a will contestant cannot rely solely on the weight of the presumption to invalidate a will and "mere suspicion of undue influence is not enough." *Dean v. Jordan*, 194 Wash. 661, 673, 79 P.2d 331 (1938); *In re Estate of Mitchell,* 41 Wn.2d 326, 353, 249 P.2d 385 (1952). "Rather, the contestant must establish undue influence by producing direct or circumstantial 'positive evidence.'" *Estate of Barnes*, 185 Wn.2d at 16 (quoting *Dean,* 194 Wash. at 673).

"Actions such as 'giving advice, arguments, persuasions, solicitations, suggestions or entreaties' generally do not amount to undue influence unless such actions are so importunate, persistent, or coercive that they effectively subdue and subordinate the will of the testator and take away his or her freedom of action." *In re Estate of Melter*, 167 Wn. App. 285, 307, 273 P.3d 991 (2012) (quoting *In re Estate of Marks,* 91 Wn. App. 325, 333, 957 P.2d 235 (1998)). Rather, undue influence is the "force or fear which destroys the testator's free agency and constrains him to do what is against his will." *In re Estate of Bottger*, 14 Wn.2d 676, 700, 129 P.2d 518 (1942).

"The appellate court's role is to review findings supporting the conclusions the trial court *did* reach, not to look for evidence supporting an alternate conclusion the court *could have* reached." *Estate of Barnes*, 185 Wn.2d at 15-16 (emphasis in the original). This court "defer[s] to the weight given to all the evidence by the trial court and its credibility assessment." *Estate of Barnes*, 185 Wn.2d at 16.

Here, Wheeler correctly points out that the trial court entered some findings that Rios's testimony was not credible. The court found that Rios's testimony, that she did not learn she was a beneficiary of Korsten's will until about one month after Korsten's death, lacked credibility. Rios conceded she had a fiduciary relationship with Korsten as her attorney-in-fact pursuant to the power of attorney executed in April 2012. Rios did actively participate in procuring the will changes, left messages for Hammermaster, dropped off and picked up the signed will, and likely wrote the note indicating Korsten's changes to the will. Rios also received a large part of Korsten's estate and was with her grandmother daily from 2011-2013 until she died. But these facts relate to the presumption of undue influence, which the parties do not dispute.

Wheeler argues that Rios failed to overcome the presumption of undue influence. We disagree. We also agree with Rios that Wheeler failed to meet her burden of establishing undue influence by clear, cogent, and convincing evidence.

Contrary to Wheeler's characterization of Hammermaster's contact with Korsten during the drafting of the new will, Hammermaster testified that he met with Korsten and talked with her over the course of the redrafting. Hammermaster saw no evidence of undue influence. Korsten expressed reasons unrelated to Rios for changing her will and was adamant about what she wanted to do. The trial court concluded that based on the testimony, Korsten decided to disinherit Wheeler based on her infidelity and repeated wrongful attempts of appropriation of Korsten's monies.

Rios did not direct Hammermaster to change the will, or even participate in discussions regarding the will. The trial court concluded that none of the meetings regarding the revisions to Korsten's will in 2012 were attended by Rios. Furthermore, Korsten's caregivers did not see any evidence that Rios exerted undue influence. The court concluded that it saw no indication that

Rios or anyone else exerted undue influence over Korsten. The court's findings are supported by substantial evidence and support that Rios successfully rebutted the presumption of undue influence. The findings also support that Wheeler failed to meet her burden to prove undue influence by Rios by clear, cogent, and convincing evidence. These findings support the court's conclusion that Korsten was not unduly influenced by Rios when she executed her revised will in 2012.

This evidence is sufficient to overcome the presumption of undue influence and it is sufficient to defeat a finding of undue influence, which must be proved by clear, cogent, and convincing evidence.

Accordingly, Korsten's argument fails and we affirm the trial court's order dismissing her will petition with prejudice.

## ATTORNEY FEES

Both parties request an award of reasonable attorney fees and costs on appeal under RAP 18.1 and RCW 11.24.050. Under RAP 18.1, the prevailing party is entitled to appellate attorney fees and costs when applicable law authorizes the award. *McGuire v. Bates*, 169 Wn.2d 185, 191, 234 P.3d 205 (2010). Under RCW 11.24.050, the prevailing party is entitled to attorney fees and costs in a will contest if the will is sustained. Because Rios prevails on appeal, we grant her request for an award of reasonable appellate attorney fees and costs. Because Wheeler does not prevail on appeal, we deny her request.

No. 54454-7-II

CONCLUSION

We hold that the trial court did not err by dismissing Wheeler's will contest with prejudice and we affirm the trial court's order dismissing the will contest with prejudice. We grant Rios' request for an award of reasonable appellate attorney fees and costs and we deny Wheeler's request for appellate fees and costs.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

GLASGOW, A.C.J.

VELJACIC, J.