**FILED**
**FEBRUARY 5, 2026**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In the Matter of:<br><br>THE HARLAN D. DOUGLASS TRUST.<br><br>---<br><br>HARLEY C. DOUGLASS, an individual and residuary beneficiary of the Harlan D. Douglass Trust,<br><br>          Respondent,<br><br>  v.<br><br>LANZCE G. DOUGLASS, individually and as a residuary beneficiary of the Harlan D. Douglas Trust,<br><br>          Appellant,<br><br>THOMAS HAMILTON, individually and as special trustee of the Harlan D. Douglas Trust,<br><br>          Defendant.<br><br>---<br><br>STACEY M. DOUGLASS BOIES, as a residuary beneficiary of the Harlan D. Douglass Trust, and as an additional necessary party,<br><br>          Petitioner,<br><br>  and | No. 39829-3-III<br><br><br><br><br><br>UNPUBLISHED OPINION |

No. 39829-3-III
*In re Harlan D. Douglass Trust*

| DEANNA MALCOM, as attorney-in-fact for HARLAN D. DOUGLASS, a beneficiary of the Harlan D. Douglass Trust, and as an additional necessary party, | |
|---|---|
| Respondent. | |

BIRK, J.* — Lanzce Douglass appeals the trial court's decision to grant Harley Douglass's second amended petition under the Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW, and set aside a special warranty deed (Hamilton Deed), which transferred property out of the Harlan D. Douglass Trust (Trust) to Harlan Douglass individually. Lanzce[1] challenges the trial court's decision to allow a postevidence pleadings amendment, whether substantial evidence supports findings of fact that Lanzce exerted undue influence, certain evidentiary rulings, whether substantial evidence supports findings of fact that Harlan never accepted the Hamilton deed, the resultant award of attorney fees to the parties prevailing in the trial court, and whether cumulative error undermined the trial court's judgment. Finding no error, we affirm and award Harley his reasonable attorney fees on appeal.

---

* The Honorable Ian S. Birk is a Court of Appeals, Division One, judge sitting in Division Three pursuant to CAR 21(a).

[1] We refer to Douglass family members by their first names for clarity. No disrespect is intended.

2

I

Trial evidence showed that Maxine Douglass executed her last will and testament (Will) on January 28, 2008, drafted by Joe Delay, her long-time attorney. Maxine created the Harlan D. Douglass Trust (Trust) in the Will. The terms of Maxine's will mandated that upon her death the residue of her estate would pass into the Trust, which was created to first benefit her husband, Harlan, and then to benefit their three children, Harley, Stacey Douglass Boies, and Lanzce. Under the terms of the Will, Harley would eventually receive 50 percent of the residual Trust property, Stacey would receive 40 percent, and Lanzce would receive 10 percent. Maxine appointed Harlan as trustee (Trustee) and designated Harley and Stacey as Co-Trustees in the event Harlan was unwilling or unable to serve as Trustee. The Will vested the Trustee with the power to distribute Trust principal to Harlan as the Trustee deemed necessary and proper after considering all other sources of income or property reasonably available, as well as the power to distribute to Harlan up to five percent of the Trust res annually.

Additionally, the Will appointed Thomas Hamilton as "Special Trustee." The Special Trustee had "the power and authority, in his sole, absolute and unfettered discretion, to make any one or more distributions to [Harlan] at any time or times from the principal of the [Trust], after taking into consideration any

factor or factors which the Special Trustee, in its sole, absolute and unfettered discretion, wishes to take into consideration."

Maxine passed away on November 14, 2016.

Harlan initiated probate of Maxine's estate and was appointed as personal representative to carry out the terms of the Will, including funding the Trust. Attorney Delay assisted in funding the trust, having represented Harlan for decades. In 2017, the probate court entered an order funding the Trust by conveying real property to the Trust. Although estimates of the value of Harlan's and Maxine's combined estates varied, it was indisputably in the hundreds of millions of dollars.

After Delay assisted in opening the probate, he realized he needed to address an issue of undivided ownership of real property. During probate, one hundred percent of the properties owned by Harlan and Maxine's Estate were owned by both Harlan and the Estate in undivided one-half interests. The goal was to have Harlan own fifty percent of the properties in fee simple and the Trust own fifty percent of the properties in fee simple. To resolve the issue, Delay and Harlan divided the properties into two separate groups of equal value, with the goal that ultimately the properties in one group would be owned by Harlan and the

4

properties in the other group would be owned by the Trust. Delay passed away on May 8, 2019.

After Delay's passing, Lanzce called Seattle attorney Michael Murphy and asked if Murphy would represent Harlan in estate planning and finish the work Delay had begun. Murphy had previously represented Harlan in a variety of matters between 2000 and 2007, but he had not represented Harlan since 2007. However, Murphy had represented Lanzce in that time frame and continuing through to the time of trial. Following the phone call between Lanzce and Murphy, a conference call was held between Lanzce, Murphy, and Harlan. During the call, Murphy, Lanzce, and Harlan discussed Murphy representing him in finishing Delay's work.

Murphy prepared an engagement letter, reflecting the scope of his representation of Harlan, on May 15, 2019. Murphy testified that in addition to seeking assistance with estate and tax planning, Harlan wished to make the allocations to the children under the Will more fair in light of his and Maxine's previous gifts to Harley. The engagement letter described intent to transfer real property into family LLCs jointly owned by Harlan, Lanzce, and Stacey, with Lanzce and Stacey having agreements to buy out Harlan's interest over time. The same day, Murphy drafted a letter of instruction intended to appear as though it

was authored by Harlan. Murphy e-mailed the letter to Lanzce, it was copied onto Harlan's letterhead, and Lanzce obtained Harlan's signature on the letter. According to the letter of instruction, Harlan requested that Murphy prepare deeds to transfer certain properties outlined in the letter from Harlan to " '2019 Douglass Family Apts. LLC.' " Murphy testified that transferring property from the Trust to LLCs would be a mechanism to achieve estate tax savings. Neither letter requested a deed that transferred property out of the Trust.

Murphy then worked with Tom Irish, an employee at Spokane Title Company (STC), to fulfill Harlan's wish to own 50 percent of his and Maxine's community property and for the Trust to own the other 50 percent. On May 28, 2019, Harlan signed an agreement with STC. The agreement provided that STC would prepare two special warranty deeds that would accomplish Harlan's desired property transfer. On July 18, 2019, Harlan signed the two special warranty deeds, prepared for him by STC and Murphy. At the time of trial, Murphy still had those two deeds in a safe in his office. Harlan's agreement with STC did not mention a third deed or the conveyance of property out of the Trust.

On August 8, 2019, Murphy e-mailed Tom Irish at STC. Murphy asked if the two July deeds had been recorded. Murphy then wrote " 'I want to discuss the next project.' " This statement was the first time Murphy brought up the subject

of a next project relating to the Hamilton Deed. This "next project" had not been mentioned in Harlan's agreement with STC. Murphy's invoices first reference the Hamilton Deed on August 12, 2019, when the relevant invoice reads, "[R]esponded to client question about Special Trustee Powers" and "preparation of a new deed from Special Trustee to H. Douglass."

Deanna Malcom testified that she worked for Harlan as his operations manager. Malcom could not recall how she came to believe there was to be a meeting, but on August 14, 2019, Malcom called Tom Hamilton and asked him to come to Harlan's office. At the time, Hamilton had been trying to get a lease extension from Harlan for his son. When she called Hamilton to set up the meeting, she believed it would be about the lease. That day, Lanzce arrived at the office, and a package had been separately delivered to the office addressed to Lanzce. Malcom described that she, Harlan, Lanzce, Hamilton sat together in the conference room. After "small talk" between Harlan and Hamilton, Lanzce told Hamilton that he was the Special Trustee under Maxine's Will. Lanzce handed Hamilton the deed, and Hamilton signed it. According to Malcom, Harlan was dozing off during the meeting and not paying attention. When asked, "Did you ever during that entire meeting observe Harlan Douglass tell Hamilton to sign that deed?," Malcom answered, "No." Malcom said that Hamilton then gave her the

7

deed to notarize. Malcom took the deed downstairs to make copies, left the original on her desk, and took copies to the conference room. The deed conveyed 224 properties out of the Trust to Harlan individually.

Harlan was no longer competent to testify at the time of trial.

Hamilton testified that he and Harlan often got together for lunch, and he believed the purpose of the meeting was to meet with Harlan. When asked why Malcom and Lanzce were in the meeting, Hamilton said it was "a puzzle." Hamilton was surprised when Lanzce interjected with Maxine's Will. Hamilton had not known before then that the Will made him Special Trustee. Hamilton testified, "Lanzce said that his dad, and Harlan was sitting right there, and I looked at Harlan, wanted me to transfer the properties, however many, to him personally." Hamilton said he asked Harlan if that is what Harlan wanted, and, Hamilton testified, "Whether he verbalized it, shook his head, or both, I can't say," but Harlan indicated affirmative agreement. Hamilton signed the deed without looking at the other pages. Harlan told him nothing about the deed at any time. Hamilton denied giving the deed to either Malcom or Harlan, though he agreed Malcom acknowledged his signature. Malcom went and made copies, and Hamilton recalled receiving a copy of the deed.

Lanzce testified that Harlan was in favor of the Hamilton Deed. Harlan told him that Harlan was having Malcom set up the August 14 meeting. He understood the purpose of the meeting was "to get Tom Hamilton to see if he would sign the deed that Mike Murphy had prepared." Lanzce said that he and Harlan had discussed that the deed covered "all the properties in Spokane County that were in the Trust." He said that Harlan was participating in the meeting and understanding what was going on. And he testified Harlan gestured to him to address the deed. After Lanzce explained Maxine's Will and the deed, he said Harlan told Hamilton, "I'd like you to sign the deed." Lanzce said that after Hamilton signed the deed, he "pushed it across the desk" to Harlan. He said Malcom located where Harlan should sign the excise tax affidavit, and Harlan signed. Lanzce testified that Malcom made copies and assured him she would record the deed.

The next day, Malcom asked Harlan's in-house legal counsel about the deed. At that point, she became aware that the deed transferred properties out of the Trust. The following week, she spoke to Hamilton. Then, she spoke with Lanzce, who told her she would be fired because she did not record the deed. Malcom testified that Lanzce said she " 'stabbed him in the back and he was going to stab me 10 times over.' " Lanzce told Malcom she had "cost him" hundreds of

9

millions of dollars.  The week after, Lanzce came to the office and again spoke to

Malcom in heated tones because she had not recorded the deed.  Hamilton testified

that Harlan's in-house counsel brought the original deed back to him.  Having

become concerned about "legal issues," Hamilton shredded the deed.

On August 29, 2019, Harley filed a complaint against Lanzce, as well as

Hamilton, individually and as Special Trustee of the Trust.  Following a bench

trial, the trial court entered 43 pages of findings of fact and conclusions of law.

The superior court found the evidence

> overwhelmingly demonstrated that the Hamilton Deed was not part
> of the Joseph Delay, Harlan Douglass and Maxine Douglass Estate
> plan and it was not part of Harlan D. Douglass' plan.  Largely,
> Lanzce Douglass, with the help of his attorney, Michael Murphy,
> conceived of a plan to disinherit Harley Douglass through the
> powers of the Special Trustee, Thomas Hamilton, and certain staged
> documents.  The scheme was not only shown by the totality of the
> evidence, but it was clear, convincing, and inescapable.

Lanzce appeals.

## II

Relevant to Lanzce's assignments of error, the trial court first concluded

that the totality of evidence established at trial "showed by clear and convincing

evidence that Harlan Douglass did not accept the Hamilton Deed, or the property

10

purported to be conveyed by the deed." Lancze argues that the trial court erroneously determined that the Hamilton Deed was not accepted. We disagree.

An appellate court will uphold challenged findings of fact and treat the findings as true on appeal if the findings are supported by substantial evidence. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). Substantial evidence is evidence that is sufficient to persuade a rational, fair-minded person of the truth of the finding. *Id*. In reviewing challenged findings for substantial evidence, we view the evidence and all reasonable inferences in the light most favorable to the prevailing party. *Dave Johnson Ins., Inc. v. Wright*, 167 Wn. App. 758, 778, 275 P.3d 339 (2012). When a trial court bases its findings of fact on conflicting evidence and there is substantial evidence to support the findings entered, we do not reweigh the evidence and substitute our judgment even though we might have resolved the factual dispute differently. *Id*. Findings of fact that are unchallenged on appeal are accepted as true. *In re Adoption of M.J.W.*, 8 Wn. App. 2d 906, 925, 438 P.3d 1244 (2019). Conclusions of law are reviewed de novo by this court and will be affirmed if supported by the findings of fact. *Id*. Credibility determinations cannot be reviewed on appeal. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

11

"To pass title effectively a deed must be delivered to and accepted by the grantee." *Clearwater v. Skyline Constr. Co.*, 67 Wn. App. 305, 318, 835 P.2d 257 (1992). Acceptance of the deed by the grantee may be presumed if the conveyance is a benefit to the grantee. *Id*. at 319. The presumption of acceptance may be rebutted only by clear, cogent, and convincing evidence. *Id*. Acceptance may be demonstrated by a grantee's act or conduct after he or she has obtained knowledge of the deed. *Id*.

Lanzce points to his characterization of the August 14, 2019 meeting in arguing that Harlan's actions that day demonstrated acceptance. Lanzce disputes the trial court's contrary findings of fact 121 and 122(h), that Harlan "never accepted individual ownership of the properties of the Hamilton Deed," because his plans "did not indicate assent to removing property from the Trust and at no time did his actions indicate acceptance of the deed or the property," and, to the contrary, his actions showed he rejected the deed.[2]

---

[2] Lanzce assigns error to several findings of fact for which he neglects to provide sufficient argument. This court generally declines to review such assignments of error. *E.g. Helmbreck v. McPhee*, 15 Wn. App. 2d 41, 68, 476 P.3d 589 (2020). In general, however, Lanzce's arguments on appeal are clearly stated and we reach their merits. We discuss specific challenged findings of fact that are most pertinent to the analysis.

The trial court's findings are supported by substantial evidence. After Hamilton signed the deed on August 14, 2019, he pushed the document on the table toward Malcom for her to notarize. She stood up and reached across the table to take the deed and notarize it. Malcom left the meeting to make copies. When she returned to the conference room, she gave Lanzce and Hamilton copies of the deed and she retained the original. The trial court found Malcom's testimony more credible than Lanzce's, a determination this court does not revisit. Thus, the evidence supported the trial court in finding "Harlan never had personal possession of the deed."

The trial court's analysis of whether Harlan accepted the deed also relied on the underlying plan to execute the July deeds as originally intended by Delay's plan, which did not include any plan to transfer property out of the Trust. As described above, the original plan was to vest half of Harlan's and Maxine's original, combined estate in the Trust, with Harlan holding the other half. Then, at trial, Malcom testified that when Harlan signed his will, Harlan "did his best job to make his estate fair." The trial court's analysis was further supported by Murphy's engagement letter referencing only the original plan to divide the estate between Harlan and the Trust, and not transferring any property out of the Trust. And it was supported by the fact that after the Hamilton Deed was not recorded,

13

Harlan never contacted Hamilton to follow through to give effect to the instrument, suggesting it never reflected his intended result. Harlan's indifference contrasted with Lanzce's anger directed toward Malcom when he learned the deed was not recorded. As the trial court reasoned, Lanzce's actions showed that the deed "was a part of his plan to gain $200 million dollars, plus or minus."

Finally, beyond never requesting action to rectify the lack of recording and Hamilton's destruction of the deed, in 2020 Harlan requested the 5 percent distribution to which he was entitled from the Trust, including properties in Spokane. The trial court concluded as a result that Harlan "continued to treat that property as Trust property. Harlan requested a distribution from the Trust, including property purportedly transferred by the Hamilton Deed."

When the conflicting evidence is viewed in the light most favorable to the prevailing party, Harley, it supports the trial court's findings and reasoning. The trial court justifiably concluded that Harlan's plan never included transferring properties out of the Trust, Harlan never wanted or intended the transfer of property out of the Trust, and Harlan's actions afterwards showed he never accepted the deed. Thus, we affirm the trial court's conclusion that by clear and convincing evidence Harlan did not accept the Hamilton Deed.

14

III

Lanzce argues the superior court erred by allowing Harley to amend his petition to add a claim of undue influence. We disagree.

Trial evidence closed on October 3, 2022. The court anticipated hearing closing arguments at a later time and entertaining proposed findings and conclusions in December 2022. On February 23, 2023, the court asked the parties to submit a chronicling of evidence on whether Harlan had the ability or capacity to accept the Hamilton Deed on August 14, 2019. The court set a hearing on March 22, 2023. At the hearing, in addition to arguing that Harlan never accepted the Hamilton Deed, Harley argued that Harlan had been vulnerable to undue influence. Harley moved orally to amend his petition to assert undue influence. After Lanzce objected, the court declined to rule on the oral motion. Harley made a written motion to amend under CR 15(b). After oral argument, the court granted the motion in part, entering a written order on May 19, 2023. In the amendment, Harley was permitted to plead that because of lack of capacity combined with undue influence exerted upon Harlan by Lanzce, Harlan lacked the free will or the ability to accept title to the properties described in the Hamilton Deed or to understand the consequences of doing so.

This court reviews a trial court's decision to either grant or deny a CR 15 motion to amend for an abuse of discretion. *R.N. v. Kiwanis Int'l*, 19 Wn. App. 2d 389, 416, 496 P.3d 748 (2021).

CR 15(b) provides in relevant part,

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

When determining if the parties impliedly consented to the trial of an issue, the court looks at the record as a whole, including whether the issue was mentioned before the trial and in opening statements, the evidence on the issue admitted at the trial, and the legal and factual support for the trial court's conclusions regarding the issue. *Mukilteo Ret. Apts., LLC v. Mukilteo Invs. LP,* 176 Wn. App. 244, 257, 310 P.3d 814 (2013). CR 15 was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result. *Caruso v. Loc. Union 690 of Int'l Bhd. of Teamsters*, 100 Wn.2d 343, 349, 670 P.2d 240 (1983).

In *Federal Signal Corp. v. Safety Factors, Inc.*, 125 Wn.2d 413, 435, 437, 886 P.2d 172 (1994), the issue of mitigation of damages was not impliedly tried by

16

the parties where neither party mentioned the issue in its pleadings, trial briefs, or

interrogatories appearing in the record, neither party specifically raised the issue in

opening statements, it was directly mentioned only in the moving party's closing,

and the parties presented very little evidence on the issue. In *Trask v. Butler*, 123

Wn.2d 835, 845-46, 872 P.2d 1080 (1994), a legal malpractice case, the Supreme

Court declined to decide the merits of a Consumer Protection Act, ch. 19.86 RCW,

claim first suggested in the plaintiff's brief in the Supreme Court. The court did

not address directly the standard of CR 15(b). And in *Dewey v. Tacoma School

District No. 10*, 95 Wn. App. 18, 26, 974 P.2d 847 (1999), an issue was not tried

by consent when the plaintiff suggested a First Amendment theory in responding

to a pretrial motion to dismiss but the issue was never the subject of trial.

In this case, by contrast, the parties' opening statements show that the

parties understood the focus of trial was Lanzce's role in procuring the Hamilton

Deed, and whether it truly reflected Harlan's intent. Harley stated in opening:

> Hamilton felt compelled by Harlan through Lanzce to sign the deed.
> And the evidence, Your Honor, is going to be that Harlan Douglass
> on the afternoon of August 14, 2019 didn't understand what was
> going on in that meeting; didn't care what was going on in that
> meeting; spent most of his time napping and dozing off.
>
> . . . .

. . . . [T]he Hamilton Deed must be set aside because Maxine's Will forbade Hamilton from acting under the compulsion of Harlan. Harlan was prohibited from compelling Hamilton to sign a deed to him to convey property. And that would extend to being compelled by Lanzce, who was seemingly acting on behalf of Harlan that day, that day being August 14th.

. . . .

. . . . So what we're going to do in this trial is we're going to show evidence to this court that we believe is going to convince the court that there was a terrible scheme hatched by Lanzce Douglass to strip all of the property out of Maxine's Trust. . . .

. . . .

What about Harlan's mental condition? That's going to factor into this, too.

. . . .

So, here you have Harlan going downhill all summer and he's got an appointment with this neurologist for some pretty fancy testing August 16. Lanzce arranges for a meeting with Hamilton on August 14. They set it for late in the afternoon while Harlan is falling asleep. They get Hamilton to sign the deed.

Lanzce stated in opening:

[W]hat we're really here to talk about is the deeds signed by Tom Hamilton on August 14, 2019. What the evidence is going to show is at that meeting he used his sole, absolute, and unfettered discretion to exercise his power and authority and he considered all factors that he wanted to in his sole, absolute, and unfettered discretion in order to make this transfer to Harlan. So he signed that deed at a meeting on August 14, 2019 at Douglass Properties. Douglass Properties is Harlan's sole proprietorship. For all particular purposes, Douglass Properties is Harlan Douglass.

18

Consistent with these opening statements, and as described above, the evidence at trial focused on the events leading up to and the meeting held on August 14, 2019 when Hamilton signed the deed. As the trial court explained in orally allowing the amendment, there was "no doubt" that "Harlan Douglass' ability or capacity to participate in the Hamilton Deed transaction and accept it and Lanzce's role or influence were tried as part of the evidentiary phase of this case."[3]

In opposing the written motion to amend, Lanzce stated that allowing amendment would deny him the opportunity "to raise affirmative defenses, to conduct discovery, to file a motion for summary judgment, to file motions in limine, and to call witnesses." But Lanzce has never specified what evidence he would have developed or needed to develop differently from the case preparation already necessary to meet the known issue of Lanzce's role in procuring the Hamilton Deed. And Lanzce never asked the trial court to continue its decision postamendment to allow evidence alleged to be newly relevant. *See V. C. Edwards Contracting Co., Inc. v. Port of Tacoma*, 83 Wn.2d 7, 14, 514 P.2d 1381

---

[3] Because Lanzce's influence in obtaining the Hamilton Deed was a central focus of the trial arguments and evidence, we are unpersuaded that a different ruling was required because, in arguing an unrelated hearsay issue during trial, Harley's attorney seemed not to dispute a question raised by Lanzce's attorney implying that undue influence was not a claim in the case.

(1973) ("Failure to request a continuance, after the court decides an amendment is proper, precludes a party from urging on appeal that the lower court abused its discretion.").  The superior court acted within its discretion in allowing the amendment to add a claim of undue influence tried by consent under CR 15(b).

IV

Lanzce argues the evidence was insufficient to support a finding of undue influence, challenging several findings of fact.  We disagree.

We review de novo whether the facts rise to the level of undue influence that is sufficient to invalidate a deed.  *Mueller v. Wells*, 185 Wn.2d 1, 9, 367 P.3d 580 (2016).  "Mental competency is presumed."  *Binder v. Binder*, 50 Wn.2d 142, 148-49, 309 P.2d 1050 (1957).  A party claiming undue influence must prove it by clear, cogent, and convincing evidence.  *Matter of Est. of Lint*, 135 Wn.2d 518, 535, 957 P.2d 755 (1998); *In re Trust & Estate of Melter*, 167 Wn. App. 285, 301, 273 P.3d 991 (2012).  When a challenged finding of fact is required to be proven at trial by clear, cogent, and convincing evidence, "the question to be resolved is not merely whether there is substantial evidence to support it but whether there is substantial evidence in light of the 'highly probable' test."  *Id.*  Under the highly probable test, the ultimate fact in issue must be shown by evidence to be highly probable.  *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973).

20

" 'Undue influence involves unfair persuasion that seriously impairs the free and competent exercise of judgment.' " *Kitsap Bank v. Denley*, 177 Wn. App. 559, 570, 312 P.3d 711 (2013) (quoting *In re the Ests. of Jones*, 170 Wn. App. 594, 606, 287 P.3d 610 (2012)). "Undue influence" means influence that controls volition, interferes with free will, and prevents an exercise of judgment and choice. *In re Est. of Haviland*, 162 Wn. App. 548, 557, 255 P.3d 854 (2011).

> Mere suspicion, even when accompanied by opportunity and motive, is insufficient to raise a substantial inference of undue influence. *In re Patterson's Estate*, 68 Wash. 377, 123 P. 515 (1912); *In re Bradley's Estate*, 187 Wash. 221, 59 P.2d 1129 (1936). Neither will mere suspicion, unaccompanied by evidentially supported implicating circumstances, give rise to a presumption of undue influence sufficient in strength to require rebuttal evidence.

*In re Est. of Smith*, 68 Wn.2d 145, 157, 411 P.2d 879 (1966) (quoting *In re Hansen's Est.*, 66 Wn.2d 166, 172, 401 P.2d 866 (1965)). "Actions such as 'giving advice, arguments, persuasions, solicitations, suggestions or entreaties' generally do not amount to undue influence unless such actions are so importunate, persistent, or coercive that they effectively subdue and subordinate the will of the testator and take away his or her freedom of action." *Melter*, 167 Wn. App. at 307 (quoting *In re Estate of Marks*, 91 Wn. App. 325, 333, 957 P.2d 235 (1998)). One may exert influence in the form of advice, persuasion, or

21

importunity without invalidating an instrument induced by these means. *In re Bottger's Estate*, 14 Wn.2d 676, 699, 129 P.2d 518 (1942).

Multiple factors can create a rebuttable presumption of undue influence. The three most important factors, that can raise the presumption on their own, are: "(1) a confidential or fiduciary relationship between the beneficiary and the testator, (2) the beneficiary's active participation in the transaction, and (3) whether the beneficiary received an unusually large part of the estate." *Kitsap Bank*, 177 Wn. App. at 570-71. In addition to considering these important factors, courts are encouraged to "consider additional factors such as [4] the age and mental or physical health of the testator, [5] the nature of the relationship, [6] the opportunity for exerting undue influence, and [7] the naturalness of the will." *Id*. at 571.

If the facts give rise to a presumption of undue influence, the burden shifts to the instrument proponent, who must rebut the presumption by producing evidence sufficient to " 'balance the scales and restore the equilibrium of evidence touching the validity of the [instrument].' " *Mueller*, 185 Wn.2d at 15 (quoting *Dean v. Jordan*, 194 Wash. 661, 672, 79 P.2d 331 (1938)).

Lanzce first argues that the evidence did not support a presumption of undue influence. Although Lanzce agrees that Harlan gave him general power of

attorney and that he and Harlan shared a relationship at the time of the underlying events, he asserts both that there is no evidence he exercised these relationships to overcome Harlan's will and that simply facilitating Harlan's connection with Murphy's legal assistance is not improper. Lanzce likens his role to cases in which scheduling appointments or connecting a testator to the fiduciary's own attorney did not amount to undue influence. *See Melter*, 167 Wn. App. at 309; *Dean*, 194 Wash. at 666-67. The superior court's supported findings are to the contrary.

Although it is true that Lanzce never used his general power of attorney to execute any documents, the superior court's findings are clearly to the effect that Lanzce played a role in procuring the Hamilton Deed that was much more significant than merely facilitating calls and arranging appointments. Lanzce connected Harlan with Lanzce's existing attorney, Murphy, merely seven days after Delay's passing. After Murphy drafted his engagement letter, he never discussed it with Harlan to make sure Halan understood it. More than simply arranging for the contact with Murphy, Lanzce obtained Harlan's signature on the engagement letter, Murphy and Lanzce dubiously drafted the letter of instruction to appear as though it had been authored by Harlan, and Lanzce obtained Harlan's signature on that document also. The letters expressly provided for property to be

transferred into the Trust, but neither references a request to transfer property out of the Trust. The initial work that Murphy did, the two July deeds, was understood by Malcom and had been part of Delay's ongoing work when he passed away. Lanzce does not challenge any of these findings, and clearly the superior court meant by them that the plan to remove properties from the Trust was conceived without Harlan's understanding. The court explained, "Harlan's conversation(s) with Murphy were well before Lanzce and Mr. Murphy conceived of the Hamilton Deed."

Citing his own trial testimony, Lanzce argues that his benefitting from the "reallocation of assets" "makes sense," pointing to his claim that Harlan had already given Harley hundreds of millions of dollars in gifts, his burgeoning relationship with Harlan, and Harley's deteriorating relationship. Lanzce thus challenges finding of fact 69, in which the superior court found that moving Harlan's personal property into family LLCs would logically even out the children's inheritance, but did not credibly evidence that property needed to be transferred out of the Trust.

But finding of fact 69 that there was no need to transfer property out of the Trust is supported by the same evidence that supported the trial court's determination that Harlan never accepted the Hamilton Deed. This included, as

24

described above, the original plan to divide Harlan's and Maxine's original estate into half held in Trust and half held by Harlan, Harlan would even out the children's inheritance through his own will, the engagement with Murphy followed the original plan with no reference to transferring property out of Trust, and Harlan never took steps to complete the recording of the Hamilton Deed, suggesting it never reflected his intent. And beyond the fact finding of fact 69 is supported by substantial evidence, on appeal Lanzce challenges it only by invoking his own, contrary trial testimony. But the trial court expressly found that Lanzce's testimony that Harlan wanted the Hamilton Deed executed was "not credible for many reasons," among them inconsistencies in his testimony, contradictions with other, credible evidence, and Lanzce's belief that he stood to benefit from the Hamilton Deed in ranges of hundreds of millions of dollars. We do not revisit this credibility determination.

Lanzce also argues that "in 2019, Harlan fully controlled his business operations." He appears through this argument to challenge certain findings leading up to and including finding of fact 77, that "Harlan's advanced age and the events described above evidence Harlan's weakened mental ability and susceptibility to undue influence."

25

When Maxine's Alzheimer's worsened, Harlan became her sole caretaker, and in 2018 Harlan became concerned that he might get Alzheimer's so he asked Malcom to alert him if she saw signs he may be having cognitive problems. In the summer of 2019, she did alert him that she had noticed signs that he was having memory problems. Malcom testified that Harlan got lost in the office at least twice in 2019, before the meeting in August. She also testified that before the meeting in August, she had observed him become repetitive, obsessed, inexplicably angry, and tearful. Thus, while there was other evidence of Harlan's mental faculties, substantial evidence supports the trial court's finding that by 2019 Harlan also suffered weakened mental ability and susceptibility to undue influence.

Lanzce does not otherwise dispute that he had a confidential or fiduciary relationship with Harlan, he was an active participant in the transaction to procure the Hamilton Deed, and he received a large benefit from the transaction. The trial court's further findings are supported that Harlan's age and mental health put him at risk of undue influence, and execution of the Hamilton deed was not a natural part of Harlan's estate plan to even out the children's inheritance. The trial evidence and the supported and unchallenged findings thus support that a

presumption of undue influence arose under the factors described in *Kitsap Bank*, 177 Wn. App. at 570-71.

Lanzce next contends that even if the presumption arose, it was rebutted by evidence that Harlan acted freely, other evidence did not show that Harlan's "will was overcome by Lanzce," and this foreclosed a conclusion by clear and convincing evidence that the Hamilton Deed was the product of undue influence. Lanzce points to evidence that Harlan signed the July deeds, Malcom notarized the Hamilton Deed and would not have done so if she believed Harlan was not competent, Harlan was managing his own affairs, and Harlan was estranged from Harley.[4]  But Lanzce's argument fails to account both for the different weight the trial court assigned to the competing evidence, and for the trial court's analysis of other, supported facts.

Again, the trial court found no credible evidence referencing the Hamilton Deed until August 9, 2019, when Murphy e-mailed about it—not with Harlan, but with STC.[5]  The transfer to be effected by the Hamilton Deed was absent from the

[4] Lanzce also argues that Harlan met with certain professionals in April 2019 and exhibited understanding of his intentions.  However, in support of this argument, Lanzce cites only declaration testimony filed with the superior court in advance of trial, none of which was admitted into evidence.

[5] Lanzce challenges finding of fact 78 to this effect, but never argues that there was any earlier reference to the Hamilton Deed.

27

letters describing Murphy's engagement by Harlan, a circumstance that was itself found to have been arranged by Lanzce as explained above. Murphy's invoices refer to calls with "L. Douglass"—presumably Lanzce—but do not include conversations with Harlan after the original call with Murphy and Lanzce. The trial court was entitled to believe Malcom's account of the August 14, 2019 meeting, in which Lanzce raised Maxine's Will, Lanzce—not Harlan—"said something to the effect of my dad wants you to transfer all the property from the Trust to him," and Harlan was not paying attention. And, as noted, after learning the Hamilton Deed was never recorded, Harlan never raised the issue with Hamilton.

Hamilton testified that he was surprised that he was mentioned in Maxine's Will when Lanzce produced it at the August 19 meeting. Hamilton said that Lanzce—not Harlan—said that "his dad . . . wanted me to transfer the properties, however many, to him personally." Hamilton testified to receiving an affirmative response from Harlan (testimony that is contradicted by Malcom's), but also testified he did not have any understanding of what properties were being transferred, he did not look at other pages of the deed besides the one he signed, and Harlan never told him anything about the deed that he signed. Thus lacking

28

any understanding of the legal effect of the deed, Hamilton confirmed he was "just there to do whatever [he] thought Harlan wanted [him] to do."

Together, the evidence supported the trial court's assessment that Lanzce and Murphy conceived of the Hamilton Deed without Harlan's input, Lanzce told Hamilton that Harlan wanted Hamilton to sign the deed, Hamilton attended the meeting to do what Harlan wanted him to do, there was "no credible evidence in the record that Harlan planned for, knew of, or wanted the drafting of the Hamilton Deed," and "Lanzce wrongfully manipulated circumstances to procure the Hamilton Deed through Mr. Murphy." Thus, although the trial court concluded for similar reasons that Harlan never accepted the Hamilton Deed, to any extent that Harlan's support for the transaction was manifested to Hamilton, that was the result of Lanzce's undue influence over Harlan and the circumstances of the transaction. Thus, the Hamilton Deed is properly set aside for this reason also.

V

In regard to the trial court's finding that Harlan had a weakened mental ability and was susceptible to undue influence, Lanzce argues that the trial court improperly relied on two sets of erroneously admitted hearsay statements.

The standard of review for evidentiary rulings made by the trial court is abuse of discretion. *Peralta v. State*, 187 Wn.2d 888, 894, 389 P.3d 596 (2017). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010).

A

First, Lanzce argues that the trial court incorrectly allowed Malcom to testify that Harlan got lost in his office, arguing that the court misinterpreted ER 803(a)(3) by admitting the testimony to show the witness's, Malcom's, state of mind, rather than the declarant's, Harlan's, state of mind. Malcom described an incident where she directed Harlan to Ron's office, but Harlan replied, " 'I don't know where to go,' " she "took him by the hand," they went to Harlan's office, and they cried together. Lanzce objected and moved to strike "the statements that she purports that Harlan said to her." Harley argued both that the testimony was admissible to show the "declarant's then existing state of mind," and that, as well as by what Harlan said, Malcom could know he was lost "from observing what he was doing."

Under ER 803(a)(3), a hearsay statement is not excluded if it is a statement of "the declarant's then existing state of mind, emotion, sensation, or physical

30

condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief." In *State v. Marintorres*, 93 Wn. App. 442, 444, 969 P.2d 501 (1999), the State charged Marintorres with escape. He wished to put on evidence that someone told him his sentence would be 120 days, purportedly to explain why he unilaterally left the detention camp where he was incarcerated. *Id.* at 447. We said any evidence he had been told his sentence was 120 days was not relevant, because there was no proof anyone had told him he could simply leave the detention camp. *Id.* at 448. And if offered to prove Marintorres's own belief, for which the statement would not be hearsay, it was still not relevant because what was relevant was whether he believed he had permission to leave. *Id.* at 448-49. We noted that ER 803(a)(3) is limited to proving the declarant's state of mind, not the hearer's. *Id.* at 449.

To the extent these principles apply here, Lanzce misperceives the trial court's ruling and the proper analysis. Harley argues that Malcom, as Harlan's longtime employee, could rationally perceive him to be lost in his own office by her observations, i.e., "from observing what he was doing," without relaying hearsay statements. Lanzce fails to challenge the admissibility of Malcom's observations, and even without the challenged hearsay statements, her observations would support the trial court's findings regarding Harlan's mental

31

decline. Further, contrary to Lanzce's argument, Malcom's report of Harlan's out-

of-court statement—" 'I don't know where to go,' "—was offered to prove

Harlan's state of mind of being lost in the moment he made the utterance. The

extent of Lanzce's cited authority, *Marintorres*, suggests no different analysis.

The trial court tenably ruled that the hearsay statements were within the scope of

ER 803(a)(3).

B

Second, Lanzce challenges a hearsay report by Malcom that Harlan had a

diagnosis of vascular dementia. Harley sought to elicit testimony from Malcom

that Harlan had such a diagnosis, asking the following:

Q      Are you aware that in December of 2019 that Harlan had
another doctor's appointment with [Dr. Sameh] Elsanadi?
A      Yes.
Q      After that doctor's appointment, did you ever tell anybody,
Joe Delay, me, Ron Jackson, anybody in the office?
A      Yes.
Q.      Well, I didn't ask you what you told them yet. Did you ever
tell any of those people, anybody that Harlan had been diagnosed
with vascular dementia?

At that point, Lanzce objected, based on the question calling for hearsay. Harley

argued Malcom could report what she told other people and that the question did

not call for hearsay. Citing "the benefit of a bench trial," the trial court elected to

"hear the testimony" and "reserve" on whether or not to consider it later in the

32

case.  Subject to this ruling, Harley asked Malcom, "after Harlan's December 2019 appointment with Dr. Elsanadi, did you tell people that he had vascular dementia?," and she answered, "Yes."

However, the court ultimately sustained Lanzce's objection.  The court later explained it "decided to disregard testimony objected to as hearsay that was introduced at trial under the exception to [the] hearsay [rule] attributed to Harlan and elicited by the Trust and Harley, as outlined in Appendix A."  Appendix A lists among the disregarded testimony the disputed question and answer concerning vascular dementia.  And consistent with this ruling, the trial court's findings did not rely on a purported diagnosis of vascular dementia.  Because the trial court sustained Lanzce's objection, he does not show a basis for appellate relief.

## VI

Lanzce argues the trial court erred by excluding evidence that Lanzce held a power of attorney that competed with Malcom's.

We review a trial court's ruling on a motion in limine for abuse of discretion.  *Garcia v. Providence Med. Ctr.*, 60 Wn. App. 635, 642, 806 P.2d 766 (1991).

Harlan executed a durable power of attorney designating Malcom as his attorney-in-fact in February 2019 (February 2019 DPOA). He executed another durable power of attorney designating Lanzce and Stacey as his co-attorneys-in-fact in April 2019 (April 2019 DPOA). The April 2019 DPOA became effective "upon the disability or incapacity of the principal." Further, the April 2019 DPOA stated that Harlan "hereby revokes any other powers of attorney which the principal may have previously executed." On August 2, 2022, Lanzce's counsel wrote Malcom, disclosing the April 2019 DPOA and invoking it based on Harlan's treating physician having testified that Harlan "is not able to manage his own property or affairs effectively." The letter requested a meeting two days later "regarding pending matters and the overall operations of Douglass Properties." Although not mentioned in the letter, the deposition testimony on which it relied had been given on April 29, 2022. Malcom moved for a preliminary injunction against the April 2019 DPOA, emphasizing that its invocation came only three court days before the then-scheduled trial date.

By order entered September 12, 2022, the trial court granted Malcom's motion for a preliminary injunction, restraining Lanzce and Stacey from taking action as Harlan's attorneys-in-fact to maintain the status quo until after the court

No. 39829-3-III
*In re Harlan D. Douglass Trust*

reached a decision after trial. By the court's order, Malcom was granted authority

to remain acting attorney-in-fact for Harlan.[6]

Before trial, Harley moved for an order striking Lanzce's contentions that

he was acting as attorney-in-fact for Harlan, precluding evidence to establish that

the April 2019 DPOA was genuine or legitimately obtained, and precluding the

introduction of the April 2019 DPOA and the testimony of Michael Turnbull, an

attorney, that Harley anticipated would testify about "who will appear at trial" as

Harlan's attorney-in-fact. The court analyzed the issue as one of late disclosure

under the case schedule order, starting from the fact that it required disclosure in

July, but disclosure was not made until the August 2 letter. Applying *Burnet v.*

*Spokane Ambulance*, 131 Wn.2d 484, 488, 933 P.2d 1036 (1997), the court

granted the motion.

Lanzce does not show that the trial court misapplied *Burnet*. Lanzce's own

position was that the April 2019 DPOA became effective at least in April 2022,

but he did not disclose it until August 2022. Lanzce acknowledges he deliberately

---

[6] This court granted interlocutory review and, other than remanding for the trial court to waive or fix a bond, left the preliminary injunction in place. *In re The Harlan D. Douglass Trust*, No. 39183-3-III, slip op. at 2 (Wash. Ct. App. Nov. 7, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/391833_unp.pdf.

withheld disclosing the April 2019 DPOA, first, he says, because Harlan wished

that he not disclose it until it became effective. But Lanzce withheld it even after

it became effective, he claims because he was taking steps to reduce Harlan's tax

burden. And neither of these explanations justifies a unilateral decision to

withhold trial evidence from a litigation adversary, in violation of a court order.

The trial court reasonably concluded that allowing inquiry into the circumstances

of the new evidence on the eve of trial would be prejudicial to other parties, and

that Lanzce withheld the evidence for strategic purposes. The court recounted the

lengthy history of the case and the need for prompt determination on the merits

and observed that a continuance was disadvantageous compared to proceeding

with trial, taking further evidence on the April 2019 DPOA if appropriate. A

"harsher" sanction requires an on-the-record consideration of whether lesser

remedies would suffice. *Id.* at 494. Without deciding whether excluding only the

newly disclosed topic from trial is a "harsher" sanction, the trial court balanced the

competing interests on the record. The trial court did not abuse its discretion in

excluding the April 2019 DPOA.

## VII

Lanzce argues that cumulative error both led to an erroneous determination

of undue influence and deprived Lanzce of the opportunity to rebut that

36

determination. Having found no error, we reject Lanzce's claim of cumulative

error.

## VIII

Lanzce argues that the trial court erred by ordering him to pay attorney fees

to Harley, the Trust, and Malcom.

The standard of review this court applies to analyze a trial court's award of

attorney fees consists of two parts:

> (1) we review de novo whether there is a legal basis for awarding
> attorney fees by statute, under contract, or in equity and (2) we
> review a discretionary decision to award or deny attorney fees and
> the reasonableness of any attorney fees award for an abuse of
> discretion.

*Falcon Props. LLC v. Bowfits 1308 LLC*, 16 Wn. App. 2d 1, 11, 478 P.3d 134

(2020). Under TEDRA, the trial court had discretion to award fees. RCW

11.96A.150.

First, Lanzce argues that the trial court erred in awarding fees to Harley,

because it erred in finding that Harley should prevail. Because we have affirmed

the trial court's judgment in favor of Harley, it follows that the trial court correctly

concluded that Harley was the prevailing party.

Second, Lanzce argues that the trial court misapplied the lodestar method

when it included in the fee award to Harley attorney fees for work on two

37

unsuccessful motions for summary judgment. The trial court recognized the motions were unsuccessful, but made a partial award of fees because it believed the time spent researching the motions was not wasted because the results were used at trial. Citing the "unique complexity, magnitude of the case, Lanzce's conduct, and the overall outcome," the court did not fully reduce the time spent on the two unsuccessful motions but instead reduced the fees by 25 percent. The trial court relied on *Baker v. Fireman's Fund Insurance Co.*, 5 Wn. App. 2d 604, 623, 428 P.3d 155 (2018), where we upheld a trial court's reasoning that " 'time spent on researching a motion for summary judgment is not unreasonable and can not be said to be unnecessary' " where " '[t]he benefits of such research would still be applicable for trial and mediation of claims.' " We can find no abuse of discretion in the trial court's assessment that some of the time spent on the unsuccessful motions was partially beneficial towards the outcome, and therefore reasonable and necessary.

Third, Lanzce argues the trial court erred by awarding fees to Malcom. Malcom sought fees on the ground she was forced to participate in the action to protect Harlan's interests. The trial court agreed, ruling that Malcom, acting as Harlan's attorney-in-fact, owed fiduciary duties to Harlan. Malcom was a necessary party, and therefore entitled to fees and costs under RCW 11.96A.150,

38

.020(2), and .030(5)(k). Because Harlan had a legal and factual interest in the case that Malcom was required to protect, the court ruled "it would be inequitable" to deny Malcom reasonable attorney fees and costs. Lanzce does not challenge the trial court's reasoning beyond arguing that Malcom "insisted she took no position in the litigation." Instead, Lanzce argues Malcom should be viewed solely as a fact witness. Lanzce's argument fails to address the trial court's reasoning that Harlan was a necessary party appearing through his attorney-in-fact. It is clear, for instance, that Malcom took actions towards safeguarding Harlan's interests, such as successfully opposing Lanzce's invocation of the competing DPOA shortly before trial. The trial court did not err in awarding Malcom reasonable attorney fees.

## IX

Both Lanzce and Harley seek reasonable attorney fees on appeal. Under RCW 11.96.150(1), "any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party . . . From any party to the proceedings." Because Harley prevails in this court, we award him his

reasonable attorney fees on appeal pursuant to RCW 11.96A.150(1), subject to his compliance with RAP 18.1(d).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Birk, J.

WE CONCUR:

_____    _____
Robert Lawrence-Berrey, C.J.    Murphy, J.